**CLERKS OFFICE US DISTRICT COURT
AT ABINGDON, VA
FILED**

October 9, 2024

**LAURA A. AUSTIN, CLERK
BY: /s/ Kendra Campbell
DEPUTY CLERK**

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ABINGDON DIVISION**

RYAN AMELIA,

                        Plaintiff,

v.

UNITED STATES OF AMERICA

and

J.C. STREEVAL
Former Warden
United States Penitentiary, Lee
Hickory Flats Road
Pennington Gap, VA 24277,

and

LOGAN SMITH
Officer
United States Penitentiary, Lee
Hickory Flats Road
Pennington Gap, VA 24277,

and

JACKIE MITCHELL
Lieutenant
United States Penitentiary, Lee
Hickory Flats Road
Pennington Gap, VA 24277,

and

RICKY D. BRADBURN
Officer
United States Penitentiary, Lee

Case No.   1:24cv42

**JURY TRIAL DEMANDED**

Hickory Flats Road
Pennington Gap, VA 24277,

and

JOSHUA ROBBINS
Officer
United States Penitentiary, Lee
Hickory Flats Road
Pennington Gap, VA 24277,

and

PRESTON G. CORBIN
Lieutenant
United States Penitentiary, Lee
Lee County Industrial Park
Hickory Flats Road
Pennington Gap, VA 24277

and

MATTHEW GLASS
Officer
United States Penitentiary, Lee
Hickory Flats Road
Pennington Gap, VA 24277,

and

RYAN SLUSS
Officer
United States Penitentiary, Lee
Hickory Flats Road
Pennington Gap, VA 24277,

and

DR. KAREEM WASIM, PsyD
Psychology Services
United States Penitentiary, Lee
Hickory Flats Road
Pennington Gap, VA 24277,

and

2

DR. BIANCA BULLOCK, PsyD
Psychology Services
United States Penitentiary, Lee
Hickory Flats Road
Pennington Gap, VA 24277,

and

DR. TIMOTHY YORK, MAT
Health Services
United States Penitentiary, Lee
Hickory Flats Road
Pennington Gap, VA 24277,

and

NANCY SMITH, FNP
Health Services
United States Penitentiary, Lee
Hickory Flats Road
Pennington Gap, VA 24277,

and

SAREENA SCOTT, R.N.
Health Services
United States Penitentiary, Lee
Hickory Flats Road
Pennington Gap, VA 24277

and

STUART SCOTT, R.N.
Health Services
United States Penitentiary, Lee
Hickory Flats Road
Pennington Gap, VA 24277

and

ERNEST L. ASHLEY, R.N.
Health Services
United States Penitentiary, Lee
Hickory Flats Road
Pennington Gap, VA 24277

3

and

KAELA BAKER
Health Services
United States Penitentiary, Lee
Hickory Flats Road
Pennington Gap, VA 24277

and

UNKNOWN TRANSPORT DEFENDANTS,

and

UNKNOWN FOUR-POINT RESTRAINT
DEFENDANTS,

and

UNKNOWON SHU DEFENDANTS,

and

UKNOWN MEDICAL DEFENDANT,

and

UNKNOWN HOSPITAL DEFENDANTS,

Defendants.

## COMPLAINT

Plaintiff Ryan Amelia ("Plaintiff" or "Mr. Amelia"), through undersigned counsel, files this

Complaint against Defendants the United States of America, J.C. Streeval, Logan Smith, Jackie

Mithcell, Ricky D. Bradburn, Joshua Robbins, Preston G. Corbin, Matthew Glass, Ryan Sluss,

Dr. Kareem Wasim, Dr. Bianca Bullock, Dr. Timothy York, Nancy Smith, Sareena Scott, Stuart

Scott, Ernest Ashley, Kaela Baker, Unknown Transport Defendants, Unknown Four-Point

4

Restraint Defendants, Unknown SHU Defendants, Unknown Medical Defendant, and Unknown Hospital Defendants (collectively "Defendants;" without the United States, "Individual Defendants"). Plaintiff seeks damages for injuries he suffered as a result of Defendants' violation of his constitutional rights through their use of excessive force and deliberate indifference and breach of their duties to protect Mr. Amelia's safety. Mr. Amelia also seeks damages based on tortious conduct committed by certain Defendants, including assault and battery. Plaintiff hereby alleges, based on his personal knowledge, information, and belief, as follows.

## NATURE OF ACTION

1. "Being violently assaulted in prison is simply not 'part of the penalty that criminal offenders pay for their offenses against society.'" *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (citations omitted). Moreover, under the Eighth Amendment, prisoners must have "the minimal civilized measure of life's necessities," *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981), including "basic human needs," such as food, sanitation, and medical care. *Id.*

2. Mr. Amelia, a resident at United States Penitentiary Lee ("USP Lee") at all times relevant to this Complaint, is among the hundreds of residents who have been routinely subjected to unwarranted and excessive physical assaults, and depravation of basic human needs in violation of the United States Constitution. Mr. Amelia's tormentors are the Warden, guards, and other staff at USP Lee who are responsible for protecting Mr. Amelia's rights, ensuring his safety, and providing for his basic human needs. These Defendants intentionally betray, spectacularly, these basic obligations to Mr. Amelia and the other residents at USP Lee. At USP Lee, residents are not only serving time, but they are also being physically and mentally destroyed by the individuals tasked with carrying out their sentences.

3. Mr. Amelia understands that, as a resident serving time in a federal penitentiary, his civil rights are subject to constraints that do not exist outside of a penitentiary. But certain

5

fundamental constitutional rights remain, even for an individual serving time, like Mr. Amelia. And a torture chamber sanctioned by the federal government in which Defendants brutally assault residents like Mr. Amelia; a prison administration in which almost-exclusively-white guards discriminate against and commit violent criminal acts disproportionately against persons of color; a prison in which Defendants enlist and threaten residents to "put in work" by committing violent physical acts against other residents; a prison staff that dehumanizes residents by parading them nearly nude through the facility while mocking their race and genitalia (and in some instances sexually assaulting residents along the way); depriving residents of food, sanitary living conditions, and basic medical care; and employing violence and restraints for periods lasting several days in contravention of codified prison policies—none of this comes even close to meeting the lowest possible standards for resident care at a federal penitentiary.

4.     To make matters worse, Defendants have engaged in a coordinated effort to silence complaints by residents by depriving them of their limited redress for these egregiously horrifying conditions.  Defendants do so by withholding the forms residents use to lodge grievances for misconduct by prison staff, destroying said forms in those circumstances where they do distribute them, refusing to submit or mail completed grievance forms in the required timeframes, and withholding mailed correspondence from the Regional Office from residents such that their deadlines to respond pass before residents can proceed with the next step in their administrative grievance process.  Defendants also intimidate and retaliate against residents who pursue legitimate administrative grievances against prison staff for abuse, including by isolating residents in the Special Housing Unit ("SHU") without justification or based on false premises; interfering with communications between residents and their counsel; and opening and reading clearly marked privileged legal mail communications.  Residents who dare to speak out against staff abuse are

6

moved to other facilities.  As a practical matter, the limited rights residents have to pursue lawsuits for abuse pursuant to the Prison Litigation Reform Act are systematically thwarted by the administration at USP Lee through the means described above.  As a result, it is virtually impossible for a resident who has suffered abuse and consistent torment since he stepped foot on the USP Lee compound, such as Mr. Amelia, to navigate a complex multi-step grievance process in order to exhaust his administrative remedies under 42 U.S.C. § 1997e(a) and then bring a civil lawsuit.

## JURISDICTION AND VENUE

5.      The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 171 and 28 U.S.C. § 1346(b) because Mr. Amelia's claims present federal questions regarding rights arising under the Constitution and laws of the United States, as well as claims alleging negligence and other wrongful acts by employees of the federal government.

6.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(b), because one or more of Defendants reside in this judicial district, and all or a substantial portion of the events, acts, or omissions giving rise to Plaintiff's claims occurred, in whole or in part, in Pennington Gap, Virginia, in the Western District of Virginia.

## PARTIES

A.      Plaintiff.

7.      Plaintiff Ryan Amelia is a forty-one-year-old man who was previously a resident at USP Lee.  Prior to his incarceration, Mr. Amelia resided in and was a citizen of the State of Michigan. Mr. Amelia arrived at USP Lee on or around January 25, 2023.  Upon his arrival, certain Defendants ceased all Mr. Amelia's mental health medications and failed to provide any substitute programmatic or therapeutic treatment.  In August 2023, other Defendants assaulted or had other

residents assault Mr. Amelia so brutally, and failed to provide proper follow-up medical care, as to cause lasting permanent damage to Mr. Amelia.  Mr. Amelia currently resides at USP Hazelton.

B.    Defendants.

8.    Defendant United States of America ("United States") created and oversees the Bureau of Prisons ("BOP"), a federal law enforcement agency within the U.S. Department of Justice that operates U.S. federal prisons and is responsible for the care, custody, and control of individuals who reside at these facilities.  The United States employs all BOP correctional officers, guards, and staff named as Defendants in this action.  At all times relevant herein, the individual Defendants in this action were acting as agents of the United States.

9.    Defendant J.C. Streeval ("Defendant Streeval")[1] is the former Warden of USP Lee, and he served as Warden during some of the time Mr. Amelia was incarcerated at USP Lee.  He was responsible for overseeing the operations at USP Lee, including resident housing decisions, the use of force, the use of restraints, and the administration and provision of medical care to residents.  He is sued here in his individual capacity. Upon information and belief, Defendant Streeval resides in Tennessee and worked in the Commonwealth of Virginia.

10.    Defendant Logan Smith ("Defendant Logan Smith") is a Correctional Officer at USP Lee.  He is sued here in his individual capacity.  Upon information and belief, Defendant Logan Smith resides and works in the Commonwealth of Virginia.

---

[1] Warden Streeval arrived at USP Lee in 2020. Since then, he has been named as a defendant in at least eighteen other actions in the U.S. District Court for the Western District of Virginia. In these actions, plaintiffs allege Warden Streeval has engaged in acts, through his work at USP Lee, relating to: failure to protect residents, torture, assault, sexual harassment, unreasonable searches and seizures, violations of due process rights, violations of equal protection rights, derelictions of duty, negligence leading to assault and death, deliberate indifference to prisoners' lives, retaliation against prisoners, abuse of power and authority, failure to follow CDC guidelines, cruel and unusual punishment, reckless disregard for life, provision of unlawful living conditions, denial of medical treatment to prisoners, unlawful imprisonment, denial of prisoner access to legal materials, mail tampering, retaliatory excessive force, falsifying official prison reports, excessive force, failing to provide access to legal remedies, and entrapment.

11.    Defendant Jackie Mitchell ("Defendant Mitchell") is a Lieutenant at USP Lee. She is sued here in her individual capacity. Upon information and belief, Defendant Mitchell resides and works in the Commonwealth of Virginia.

12.    Defendant Ricky D. Bradburn ("Defendant Bradburn") is a Correctional Officer at USP Lee. He is sued here in his individual capacity. Upon information and belief, Defendant Bradburn resides and works in the Commonwealth of Virginia.

13.    Defendant Josh Robbins ("Defendant Robbins") is a Correctional Officer at USP Lee. He is sued here in his individual capacity. Upon information and belief, Defendant Robbins resides and works in the Commonwealth of Virginia.

14.    Defendant Preston G. Corbin ("Defendant Corbin") is a Correctional Officer at USP Lee. He is sued here in his individual capacity. Upon information and belief, Defendant Corbin resides and works in the Commonwealth of Virginia

15.    Defendant Matthew Glass ("Defendant Glass") is a Correctional Officer at USP Lee. He is sued here in his individual capacity. Upon information and belief, Defendant Glass resides and works in the Commonwealth of Virginia.

16.    Defendant Ryan Sluss ("Defendant Sluss") is a Correctional Officer at USP Lee. He is sued here in his individual capacity. Upon information and belief, Defendant Sluss resides and works in the Commonwealth of Virginia.

17.    Defendant Dr. Kareem Wasim ("Defendant Wasim") is a psychologist within Psychology Services at USP Lee. He is sued here in his individual capacity. Upon information and belief, Defendant Wasim resides and works in the Commonwealth of Virginia.

9

18.     Defendant Dr. Bianca Bullock ("Defendant Bullock") is a psychologist within Psychology Services at USP Lee.  She is sued here in her individual capacity.  Upon information and belief, Defendant Bullock resides and works in the Commonwealth of Virginia.

19.     Defendant Dr. Timothy York ("Defendant York") is a doctor within Health Services at USP Lee.  He is sued here in his individual capacity.  Upon information and belief, Defendant York resides and works in the Commonwealth of Virginia.

20.     Defendant Nancy Smith ("Defendant Nancy Smith") is a physician's assistant within Health Services at USP Lee.  She is sued here in her individual capacity.  Upon information and belief, Defendant Nancy Smith resides and works in the Commonwealth of Virginia.

21.     Defendant Sareena Scott ("Defendant Sareena Scott") is a nurse within Health Services at USP Lee.  She is sued here in her individual capacity.  Upon information and belief, Defendant Sareena Scott resides and works in the Commonwealth of Virginia.

22.     Defendant Stuart Scott ("Defendant Stuart Scott") is a nurse within Health Services at USP Lee.  He is sued here in his individual capacity.  Upon information and belief, Defendant Stuart Scott resides and works in the Commonwealth of Virginia.

23.     Defendant Ernest L. Ashley ("Defendant Ashley") is a nurse within Health Services at USP Lee.  He is sued here in his individual capacity.  Upon information and belief, Defendant Ashley resides and works in the Commonwealth of Virginia.

24.     Defendant Kaela Baker ("Defendant Baker") is a nurse within Health Services at USP Lee.  She is sued here in her individual capacity.  Upon information and belief, Defendant Ashley resides and works in the Commonwealth of Virginia.

25.     Unknown Transport Defendants are correctional officers at USP Lee who participated in Mr. Amelia's transport from B-Unit to the SHU on August 26, 2023.  They are sued

10

in their individual capacities.  Upon information and belief, Unknown Transport Defendants work and reside in the Commonwealth of Virginia.

26.     Unknown Four-Point Restraint Defendants are correctional officers at USP Lee who participated in the torture of Mr. Amelia while he was in four-point restraints from August 26, 2023, to August 29, 2023.  They are sued in their individual capacities.  Upon information and belief, Unknown Four-Point Restraint Defendants work and reside in the Commonwealth of Virginia.

27.     Unknown SHU Defendants are correctional officers at USP Lee who participated in the assault of Mr. Amelia on August 30, 2023, outside the Lieutenant's Office and who further contributed to Mr. Amelia's physical and emotional torture while he was in the SHU from August 30, 2023 to on or around December 12, 2023.  They are sued in their individual capacities. Upon information and belief, Unknown SHU Defendants work and reside in the Commonwealth of Virginia.

28.     Unknown Medical Defendant is an employee within the Health Services Department at USP Lee who participated in the abuse of Mr. Amelia while he was in four-point restraints from August 26, 2023 to August 29, 2023.  They are sued in their individual capacity. Upon information and belief, the Unknown Medical Defendant works and resides in the Commonwealth of Virginia.

29.     Unknown Hospital Defendants are correctional officers who intervened with Mr. Amelia's medical care at Holston Valley Medical Center in Kingsport, Tennessee.  They are sued in their individual capacities.  Upon information and belief, Unknown Hospital Defendants work and reside in the Commonwealth of Virginia.

11

## FACTS

### USP Lee

30.     USP Lee is a federal penitentiary located in Pennington Gap, Virginia.

31.     USP Lee is a high-security facility that houses approximately 1,500 adult males who are considered high security offenders.[2]  USP Lee has twelve housing units located in three buildings.  Each housing unit can house 128 offenders.[3]

32.     The Health Services Division at USP Lee is responsible for "deliver[ing] medically necessary health care to [residents] effectively in accordance with proven standards of care without compromising public safety concerns inherent to the Bureau's overall mission."[4]  The BOP's own core principles recognize that all residents "have value as human beings and deserve medically necessary health care," and residents have a "right to access health care."[5]

33.     The Psychology Services Department at USP Lee is responsible for providing psychological services, which include the "assessment and treatment of mental health disorders as well as evidence-based programs to reduce the risk of recidivism and institution misconduct."[6]

34.     The BOP has created a Care Level Classification System for Medical and Mental Health Conditions or Disabilities for the purported purpose of assigning each resident to an institution that can best meet each individual's care needs.[7]  There are four care levels in the classification system, and an assigned care level is determined by the individual's medical and/or

[2] Charles Thronton et al., *USP Lee Follow-Up Inspection Report*, D.C. Corr. Info. Council (Sept. 6, 2019), https://cic.dc.gov/sites/default/files/dc/sites/cic/page_content/attachments/USP%20Lee%20Inspection%20Report%20FINAL%20with%20BOP%20response%209-6-19.pdf.

[3] *USP Lee*, Fed. Bureau of Prisons, https://www.bop.gov/locations/institutions/lee/.

[4] *Health Services Administration*, Fed. Bureau of Prisons at 1 (June 26, 2014), https://www.bop.gov/policy/progstat/6010_005.pdf.

[5] *Id.* at 2–3.

[6] *Psychology Services Manual*, Fed. Bureau of Prisons at 1 (Aug. 25, 2016), https://www.bop.gov/policy/progstat/5310_017.pdf.

[7] *Care Level Classification for Medical and Mental Health Conditions and Disabilities*, Fed. Bureau of Prisons at 1 (May 2019), https://www.bop.gov/resources/pdfs/care_level_classification_guide.pdf.

mental health needs based on the chronicity, complexity, intensity, and frequency of interventions and services that are required, as well as the resident's functional capabilities.[8]

35.     Care Levels 1 and 2 are provisional care levels which are assigned by the Designation and Sentence Computation Center ("DSCC") to newly sentenced residents meeting Care Level 1 or 2 criteria, primarily based on information contained in the resident's presentence investigation report.  Upon a resident's transfer to a new BOP facility, and after an initial or provisional evaluation is performed, a resident's care level can be redesignated to a Care Level 3 or 4 if the resident meets the criteria.[9]

36.     Residents assigned a Care Level 1 may have limited medical needs that can be managed by clinical evaluations every six to twelve months, while residents assigned to Care Level 2 require enhanced medical resources and clinical evaluations anywhere from monthly to every six months.[10]

37.     Residents assigned Care Levels 3 and 4 typically suffer from complex or chronic physical and mental health conditions and require more frequent clinical contacts or enhanced medical services that are only available at a BOP Medical Referral Center in order to maintain stability over their conditions.[11]

38.     In addition to a designated Care Level, residents suffering from a disease or condition that requires monitoring or treatment for greater than twelve months receive chronic care treatment.[12]  Residents whose conditions require intensive clinical evaluations beyond three-to-six

---

[8] *Id.*
[9] *Id.*
[10] *Id.* at 2.
[11] *Id.*
[12] *Id.* at 3.

months, a limited period of increased frequency of monitoring and/or treatment, are also typically considered chronic.[13]

39.    During a transfer and intake at a new facility, a resident retains the medication that was prescribed by another BOP facility so long as it is not "otherwise restricted by policy (e.g., controlled substance)."[14]

40.    When a resident receives medication through the pill line at their facility, the staff member distributing the medication is required to identify the resident using two forms of identification before administering the dose.[15] Forms of acceptable identification include a photo ID, date of birth, registration number, or name.[16]

41.    Once appropriately identified, the staff member provides the resident with the medication, ensures they swallow it, and documents the administration in the Medication Administration Record ("MAR").[17] If a resident refuses to accept the medication or is deemed a "no-show," that information is required to be reflected in the MAR.[18]

42.    When a facility is on lockdown or when a resident is in the Special Housing Unit ("SHU"), residents are unable to receive medications through the facility's pill line. In these circumstances, except when a resident is permitted to self-carry their medications, residents rely on BOP staff to deliver medications to them through their cell doors.

43.    USP Lee has one SHU. The purported purpose of the SHU is to 1) house residents in disciplinary segregation as a result of a formal disciplinary finding; 2) house residents on

---

[13] *Id.* at 3–4.
[14] *Id.* at 22.
[15] *Id.* at 18.
[16] *Id.*
[17] *Id.* at 19.
[18] *Id.*

administrative detention pending transfer or investigation of a disciplinary infraction; and 3) house residents in protective custody.[19]

44.    In reality, the SHU, which is routinely kept at full capacity by USP Lee's administration, is used as a venue for extreme abuse and retaliation against residents by prison staff.  Indeed, individuals housed in the SHU often hear the screams of other residents as they are tortured by prison staff around the clock, typically within the two holding cells located in the SHU.  These holding cells do not have toilets, and individuals who are abused in those cells, often over the course of consecutive days, are forced to defecate and urinate on themselves.

45.    The prison staff, including Defendants, strategically conceal their abuse, and will often place toilet paper over the cameras in the SHU holding cells, which do not capture sound, to prevent their actions from being recorded.  In other instances, residents are taken by prison staff to blind spots in the SHU and passages leading to and from it, where cameras cannot record the abuse that occurs.  In still other instances, prison staff will threaten an individual to violently attack their cellmate within their own cell, where cameras are also not located.

46.    To further conceal their abuse, residents are forced, under the threat of additional violence, to state in a video recording captured by medical personnel that they do not have any injuries.

47.    The SHU contains a medical examination room that is rarely, if ever, used to conduct actual medical evaluations.  The medical staff tasked with providing care in the SHU, including mental health professionals, are deliberately indifferent to the abuse and torture that takes place and the severe injuries that result.  USP Lee medical staff are often complicit in the efforts of other prison staff to conceal injuries by ignoring injuries to prisoners and/or by falsifying

---

[19] *Special Housing Units*, Fed. Bureau of Prisons at 3–6, 9 (Nov. 23, 2016), https://www.bop.gov/policy/progstat/5270.11.pdf.

medical reports. Indeed, medical staff, including Defendant Stuart Scott, are often present in the cell (and sometimes themselves participate in the assault of residents) while prisoners are being repeatedly kicked, punched, and tortured by prison staff, but they nevertheless report that victims have suffered no injuries.

48.    The conditions of confinement in the SHU are inhumane. Individuals are not provided proper or clean clothing and are sometimes forced by prison staff to wear paper gowns that expose their genitalia—leading to sexually and racially abusive commentary, and at times sexual abuse, by prison staff. When prisoners are given SHU uniforms, they are often forced to wear the same tattered, dirty clothing for several days in a row. Individuals are given a total of 10–12 squares of toilet paper per day. The toilets malfunction regularly, and individuals are forced to leave their feces in towels until maintenance staff arrives, which sometimes takes several days. Individuals are forced to eat bologna sandwiches after prison staff smear them across a dirty floor. In some cases, food is withheld from prisoners altogether for days on end. Recreation time is inconsistent and generally nonexistent. Windows in the SHU are sandblasted which prevents any natural light from entering cells, leaving residents to receive small slivers of sunlight through tiny cracks in the sandblast.

49.    Access to the law library in the SHU is non-existent due to prison staff routinely reporting that the law library computers are broken or inaccessible.

50.    Prisoners suffering from these horrible conditions and treatment are given only limited access to grievance forms to lodge complaints against USP Lee staff. USP Lee officers will not only refuse to give the grievance forms to individuals who request them, but when they do, will also at times provide the wrong form, and/or fail to transmit completed grievance forms

16

to the appropriate personnel in the required timeframes. Indeed, USP Lee officers threaten individuals who attempt to access administrative grievances with more and more severe violence.

51. Although the SHU is generally reserved for individuals who either pose a threat to other residents, staff, or are at risk of harm, Defendant Bradburn, Defendant Mithcell, Defendant Logan Smith, and Defendant Robbins contribute to the confinement of individuals like Mr. Amelia in the SHU for no legitimate reason. Residents are remanded to the SHU (which is almost always fully occupied) so that prison staff can take advantage of seemingly vulnerable residents, and/or as a retaliation for an individual's complaints regarding the unconstitutional conditions at USP Lee and/or requests for medical and mental health care.

52. When all of the cells in the SHU are full and prison staff want to transfer an individual in a particular unit to the SHU, the resident's particular unit is placed on "lockdown." When a unit is on lockdown, individuals in that unit do not receive hot meals, are not permitted to shower regularly, do not receive clean clothing, do not receive phone calls or visits from family, and cannot access the prison's programming or the law library.

53. The almost-exclusively-white prison staff at USP Lee discriminates against residents of color by disproportionately targeting them for physical violence, depriving them of medical attention and other basic rights, and housing them in the SHU. Prison staff also regularly, consistently, and openly use vulgar racial epithets to refer to Black and Hispanic residents. Defendants take pride in their culture of violence against non-white residents by gruesomely pulling out residents' hair and hanging it for display on the penitentiary's fences.

54. Prison staff often force prisoners to "put in work" by fighting each other, targeting certain residents for violence, including Mr. Amelia. USP Lee officers purposefully pair individuals who pose a safety threat to each other in the same cell—creating dissonance between

17

them by sharing otherwise protected information about the individual's prior conviction or disseminating lies about the same based on prior disciplinary infractions. USP Lee officers will alert one cellmate that the other is a child molester, referring to the offending resident as a "cho mo," and then demand that his non-offending cellmate beat the one labeled as a "cho mo." USP Lee officers threaten to physically assault and abuse any cellmates who do not comply. As a result, most cellmates agree to fight each other rather than risk organized assault by the USP Lee officers.

55.     The culture of inhumane violence and abuse at USP Lee, experienced first-hand by Mr. Amelia, has been previously documented at length. In a September 6, 2019 "Follow-Up Inspection Report,"[20] investigators at the District of Columbia Corrections Information Council (the "CIC")[21] reported a litany of unconstitutional and sub-standard practices, including the following:

- Many residents expressed the expectation that they would face some form of retaliation for their participation in CIC interviews, from physical assaults by staff, to loss of facility jobs, to having their mail held for an excessive period.[22]

- Individuals reported being left in four-point restraints for 12 to 13 hours and more than 16 hours without access to toilets.[23]

---

[20] *See generally* Charles Thronton et al., *USP Lee Follow-Up Inspection Report*, D.C. Corr. Info. Council (Sept. 6, 2019), https://cic.dc.gov/sites/default/files/dc/sites/cic/page_content/attachments/USP%20Lee%20Inspection%20Report%20FINAL%20with%20BOP%20response%209-6-19.pdf.

[21] The District of Columbia does not maintain its own prison system. Instead, individuals sentenced for felony offenses under the D.C. Code are transferred to the federal Bureau of Prisons. The CIC is an independent oversight entity maintained by the U.S. Congress and the Council of the District of Columbia to inspect, monitor, and report on conditions of confinement at all facilities, including federal facilities, where D.C. Code offenders are housed.

[22] *Id.* at 8, I.

[23] *Id.* at 8, II.

- Several individuals mentioned a regular practice in which residents were assaulted, restrained, put in a paper gown, and forced to walk backwards in view of other residents.[24]

- One resident was slammed to the ground by an officer and then tied to a chair and left in an office for an hour before being transported to the SHU.[25]

- Residents said that staff beat residents with apples in socks or through a shield to prevent leaving marks of the assault.

- Individuals reported sexual assault or sexual harassment by staff, including seeing an officer grab a resident's testicles.

- One resident reported that a lieutenant put a shield on the resident's chest, and kneeled on it while the resident was on his back and shackled.[26]

- Prison staff regularly use racial slurs.[27]

- During cell shakedowns, officers routinely sweep residents' belongings into the trash, including clothes, food, and hygiene products purchased off commissary, and fail to provide documentation of the confiscation of their property.[28]

- The USP Lee staff undermine or outright foreclose residents from pursuing the Bureau of Prisons Grievance Process.  Residents have complained of being told by Warden Streeval that grievances would "never make it out of the

---

[24] *Id.*
[25] *Id.*
[26] *Id.*
[27] *Id.* at 8, IV.
[28] *Id.*

19

SHU."[29] Other prison staff have told residents that their complaints will never go anywhere "because the Warden will lie for his staff."[30]

- Officers and USP Lee leadership have refused to separate cellmates who requested separation due to interpersonal conflict and the inherent safety risks caused by the conflicts, and have told residents to fight or stab each other.[31]

- Residents are not provided adequate medical care.[32]

- Residents have been forced to clean up raw sewage flooding into the cells without adequate protection.[33]

- USP Lee was on lockdown for most of 2018 because the SHU was operating at or near capacity.[34]

56.     As described further below, nothing has changed at USP Lee since the CIC report was issued.  Indeed, undersigned counsel has filed in this Court no less than five matters on behalf of USP Lee residents, all alleging excessive use of force in virtually the same context as alleged by Mr. Amelia.  The injuries sustained by Mr. Amelia in 2023 and the unconstitutional practices that continue to be the norm at USP Lee are just the latest in a history of abuse that goes back many years.

**BOP Guidelines on Use of Force**

57.     The injuries sustained by Mr. Amelia arose from practices that are expressly forbidden under the policies and regulations that govern staff conduct at USP Lee.

---

[29] *Id.*
[30] *Id.*
[31] *Id.*
[32] *Id.* at 11, V.
[33] *Id.* at 12, VI.
[34] *Id.* at 9, III.

58.     The BOP strictly limits the use of force, including the placement of residents in restraints, as a last alternative after all other reasonable efforts to control a resident or situation have failed.[35]  When authorized, staff must use only that amount of force necessary to gain control of the resident, to protect and ensure the safety of other residents, to prevent serious property damage, and to ensure institutional security and good order.[36]

59.     Prison staff may only use physical restraints if it is necessary to gain control of a resident who appears to be dangerous because the resident:  (a) assaults another individual; (b) destroys government property; (c) attempts suicide; (d) inflicts injury upon self; or (e) becomes violent or displays signs of imminent violence.[37]

60.     Under no circumstances may physical restraints be employed to punish residents.[38]

61.     BOP regulations further state that prison staff may temporarily apply physical restraints when one of the above requirements is met; however, the Warden or designee must decide whether the use of physical restraints should continue.[39]  If physical restraints are used, BOP policy mandates that the least restrictive restraint method be used that is necessary for the situation.[40]  Specifically, "ambulatory restraints" (i.e., handcuffs, leg irons, and a belly chain) should initially be used if possible, and "four-point restraints" (i.e., chaining a resident to a bed at his wrists and ankles) should be used if they are the only means available to obtain and maintain control over a resident.[41]  The Warden is the only official at the prison who can decide whether

---

[35] *Use of Force and Application of Restraints*, Federal Bureau of Prisons ¶ 5 (Nov. 30, 2005), https://www.bop.gov/policy/progstat/5566_006.pdf.
[36] *Id.* ¶ 6(c).
[37] *Id.* ¶ 1.
[38] *Id.* ¶ 6(h)(1).
[39] *Id.* ¶ 6(d).
[40] *Id.* ¶ 9.
[41] *Id.* ¶ 10.

and when "four-point restraints" should be used, and this duty cannot be delegated below the Warden's level.[42]

62.    When a resident is restrained for longer than eight hours, BOP regulations require that the Warden, the Warden's designee, or the institutional administrative duty officer notify the BOP's Regional Director or Regional Duty Officer.[43]

63.    When a resident is chained using the "four-point restraint" method, a review of that resident's chaining in four-point restraints must be made by a lieutenant every two hours to determine if the restraints have had a calming effect so that the resident may be released from the restraints.[44]

64.    As soon as an officer determines the resident has regained physical control and is no longer a threat to himself, other residents, or property, their restraints must be removed.[45] Staff members violate BOP policy if they keep residents restrained longer than necessary, or if they restrain residents to punish or discipline them.[46]

65.    Under BOP policy, all "use of force incidents must be reported and investigated . . . to eliminate the unwarranted use of force."[47] In addition, prison staff must report the use of force directly to the Assistant Director, Correctional Programs Division; Assistant Director, Health Services Division; Central Office Correctional Services Administrator; Regional Director; and the Regional Correctional Administrator.[48] These reporting protocols ensure that BOP management, from prison staff to the Warden to the Regional Director of the BOP,

---

[42] *Id.*
[43] *Id.* ¶ 10(g).
[44] *Id.* ¶ 10(e).
[45] *Id.* ¶ 5.
[46] *Id.* ¶ 6(b).
[47] *Id.* ¶ 6(j).
[48] *Id.* ¶ 14(a)(1)–(5).

participates in the decision-making and monitoring process in the use of force, and that prison staff do not inappropriately use force on residents.

66.    As discussed further below, virtually none of these BOP regulations were complied with in using restraints on Mr. Amelia.

### Mr. Amelia's Mental Health History

67.    On or about 2003–2004, Mr. Amelia was diagnosed with intermittent explosive disorder with mixed anxiety and depression and adjustment disorder.

68.    In approximately 2003, Mr. Amelia was diagnosed with paranoid schizophrenia.

69.    Prior to his incarceration, Mr. Amelia received federal social security disability benefits based on these diagnoses.  As part of this application process, on or about 2017, Mr. Amelia was required to meet with a government-sponsored psychiatrist/psychologist, who confirmed Mr. Amelia's diagnoses.

70.    In September 2018, Mr. Amelia was transferred to the care of the BOP.  At MCC Chicago, Mr. Amelia was clinically evaluated to determine his mental and physical health needs. At MCC Chicago, Mr. Amelia was diagnosed with anxiety disorder, major depressive disorder, schizoaffective disorder, and mood disorder due to known physiological condition.  As a result, Mr. Amelia was prescribed Zyprexa and Depakote ER, medications commonly used to treat schizophrenia and bipolar disorder, to reduce his presenting symptoms.

71.    Approximately two months later, Mr. Amelia was transferred to FCI Greenville. There, Mr. Amelia was again clinically interviewed to determine his psychological needs.

72.    Treatment staff at FCI Greenville diagnosed Mr. Amelia with mood disorder due to a known physiological condition, schizoaffective disorder, and major depressive disorder. Mr. Amelia's prescriptions for Zyprexa and Depakote ER were maintained.

23

73.     Further, Mr. Amelia was classified as a Mental Health Care Level 2 due to his active prescription for Zyprexa.  As a result of this designation, Mr. Amelia received regular clinical visits from Psychology Services staff at FCI Greenville.

74.     In January 2019, Mr. Amelia's MH Care Level was downgraded from a Level 2 to a Level 1 after treatment staff concluded his symptoms were well managed by his current medication regimen.  However, on or around this time, Mr. Amelia became noncompliant with his medication and eventually was discontinued from his medication.

75.     In April 2020, Mr. Amelia requested to be placed back on his mental health medication at FCI Greenville, and began again to take Zyprexa and Depakote ER.

76.     Mr. Amelia was transferred to USP McCreary in September 2020.  While there, Mr. Amelia continued to receive his mental health medication.

77.     In early December 2020, Mr. Amelia was placed on an additional medication, BuSpar, to help reduce his increased anxiety.

78.     Mr. Amelia continued to take his mental health medications, including BuSpar, Depakote ER, and Olanzapine, throughout the rest of his time at USP McCreary, as well as during his transfer through FCI Atlanta and FTC Oklahoma on his way to USP Lee.

### Mental Health Treatment at USP Lee

79.     Mr. Amelia arrived at USP Lee in late January 2023 following his transfer from USP McCreary.  At the time of his arrival, Defendant Streeval was the Warden, and responsible for Mr. Amelia's mental health care.[49]  Upon his arrival to USP Lee, Mr. Amelia was processed, as are all arriving residents, through the Receiving and Discharge Unit ("R&D").  While there, Mr. Amelia was instructed to complete an intake screening form.  By means of the form,

---

[49] *Treatment and Care of Inmates with Mental Illness*, Fed. Bureau of Prisons at 4 (May 1, 2014), https://www.bop.gov/policy/progstat/5310_16.pdf

Mr. Amelia disclosed a list of his active prescriptions[50] and also indicated feeling some anxiety due to his new designation. During the entire period Mr. Amelia was being processed in R&D, he had no interactions with medical or Psychology Services staff.

80.  According to Mr. Amelia's medical records, Mr. Amelia allegedly met with Dr. Capriles-Mercado for an intake screening on January 31, 2023. However, this interaction never occurred. In fact, Mr. Amelia never met or spoke to Dr. Capriles-Mercado during the time he was incarcerated at USP Lee.

81.  According to the intake note in his medical record, Mr. Amelia allegedly told Dr. Capriles-Mercado that he was first diagnosed with paranoid schizophrenia in approximately 2014 and that he managed his symptoms with the medication Zyprexa. Mr. Amelia "confirmed" that he took BuSpar and was experiencing anxiety due to his current placement at USP Lee.

82.  Dr. Capriles-Mercado wrote in the intake screening note that Mr. Amelia had "no reported symptoms" during the encounter. Additionally, Dr. Capriles-Mercado assigned Mr. Amelia a Mental Health Care Level 1 reporting that Mr. Amelia showed "no significant level of functional impairment associated with a mental illness; and demonstrates no need for regular mental health interventions. Having no history of serious functional impairment due to mental illness, or, if a history of mental illness is present, the inmate has consistently demonstrated appropriate health seeking behavior in response to and reemergence of symptoms." Dr. Capriles-Mercado also recommended that Mr. Amelia participate in a drug treatment program.

83.  However, this summation of Mr. Amelia's mental health history is inaccurate and incomplete. Mr. Amelia was first diagnosed with paranoid schizophrenia in 2003 or 2004. Moreover, Mr. Amelia arrived to USP Lee from USP McCreary (through now-FCI Atlanta) with

---

[50] Mr. Amelia disclosed his active prescriptions for: Buspar, Depakote, Zyprexa, cholesterol medication, omeprazole, and his albuterol inhaler.

active prescriptions for not only BuSpar and Zyprexa, but also Depakote. Dr. Capriles-Mercado's summation of his "conversation" with Mr. Amelia only seemingly captures some of Mr. Amelia's mental health history, and fails to document the prescriptions for BuSpar, Zyprexa, and Depakote that Mr. Amelia was taking when he arrived at USP Lee, and which were refilled for 30 days after his arrival.

84.    Following his time in R&D, Mr. Amelia was designated to B-unit. For the next 30 days, Mr. Amelia self-administered his doses of BuSpar and Depakote and received Zyprexa through the institution's pill line.

85.    Prior to running out of his psychiatric medications and then right after he ran out, Mr. Amelia began to submit electronic "Inmate Requests to Staff" (colloquially and hereinafter known as "cop-outs") to Psychology Services requesting to be seen by treatment staff to ensure that that his medications would be refilled, as well as assistance in enrolling in other treatment programs.

86.    Hearing nothing in response to his electronic cop-outs to Psychology Services, on or around March 9, 2023, Mr. Amelia went to sick call and spoke with Defendant Nancy Smith. Once in Health Services, Mr. Amelia inquired about having each of his medications, including non-psychiatric medications, refilled. According to Defendant Nancy Smith's administrative note summarizing this encounter, she planned to "renew" all of Mr. Amelia's medications to get him through to his next chronic care appointment. Despite this, Defendant Nancy Smith only renewed Mr. Amelia's physical health medications; none of his psychiatric medications were renewed.

87.    Following Defendant Nancy Smith's note and conversation with Mr. Amelia, Defendant York discontinued Mr. Amelia's prescriptions of Zyprexa, Depakote, and BuSpar under the pretense that Mr. Amelia "has no supporting DSM diagnoses" and "Psychology has evaluated

26

inmate and did not diagnose any further psychiatric conditions." Prior to this discontinuation, however, Mr. Amelia was not once seen, counseled, or evaluated by a member of Psychology Services at USP Lee.

88.     In fact, Mr. Amelia's first interaction with Psychology Services occurred 12 days later, and nearly two months after he arrived at USP Lee, on March 21, 2023. At this time Defendant Bullock administered three different psychological tests to Mr. Amelia, the Kaufman Brief Intelligence Test 2nd Edition ("KBIT-2"), a personality assessment inventory ("PAI"), and a Structured Interview of Reported Symptoms 2nd Edition ("SIRS-2"). The KBIT-2 is a brief measure of verbal and nonverbal intelligence,[51] the PAI is a self-reported inventory that assesses adult personality and psychopathology,[52] and the SIRS-2 is an assessment designed to evaluate deliberate distortions in self-reported symptoms.[53]

89.     Following the administration of these tests, Defendant Bullock determined that Mr. Amelia was adjusting adequately to USP Lee, and he did not present any signs of mania, psychosis, or acute distress. Defendant Bullock also concluded that Mr. Amelia did not present symptoms of chronic mental health diagnosis that would require an elevated Mental Health Care Level assignment.

90.     Defendant Bullock's conclusions appear to ignore the records showing that Mr. Amelia was prescribed Zyprexa, Depakote, and BuSpar at his prior institution, USP McCreary. Her recommendations also appear to ignore Mr. Amelia's lengthy history of medication

---

[51] C. Holley Pitts & Carolyn B. Mervis, *Performance on the Kaufman Brief Intelligence Test-2 by Children with Williams Syndrome*, 121 Am. J. Intellectual Dev. Disability 33, 33 (2016).
[52] Morgan N. McCredie et al., *Personality Assessment Inventory (PAI) for assessing disordered thought and perception*, Am. Psych. Ass'n, 79, 79 (2021).
[53] Dustin B. Wygant, *Structured Interview of Reported Symptoms-2nd Edition (SIRS-2): Use and Admissibility in Forensic Mental Health Assessment*, 104 J. of Personality Assessment 265, 265 (2022).

management during his time in the Michigan Department of Corrections and per his Presentence Investigation Report (PSI), in the community.

91.    Defendant Bullock's conclusions also ignore Mr. Amelia's reports to BOP staff that he experienced auditory hallucinations for the last three years and that he had been treated over the course of his life for a variety of mental health disorders, including oppositional defiant disorder, anger difficulties, schizophrenia, major depressive order, and intermittent explosive disorder.

92.    Following this testing, Defendant Bullock scheduled an appointment for Mr. Amelia on March 23, 2023 to discuss the results of her testing.  However, Mr. Amelia's unit was placed on lockdown that day, so he was unable to appear for the scheduled appointment.

93.    On March 30, 2023, and without meeting with or notice to Mr. Amelia, Defendant Bullock concluded that Mr. Amelia's history of auditory and visual hallucinations and paranoia are "inconsistent with genuine symptoms of a psychotic disorder," and the symptoms he endorsed on the SIRS-2, PAI, and during her clinical interview are "uncommon" for those who are diagnosed with psychotic disorders.

94.    Defendant Bullock diagnosed Mr. Amelia with Other Specified Personality Disorder with Antisocial Personality Traits and Malingering.  Defendant Bullock maintained Mr. Amelia's diagnosis of Opioid Use Disorder.  Defendant Bullock also noted that Mr. Amelia exhibited symptoms of anxiety, but found there was no evidence to suggest that the symptoms were "clinically significant."  Defendant Bullock again placed Mr. Amelia on a callout for March 31, 2023, to review the test results.  However, Mr. Amelia's unit was again placed on lockdown, so he was unable to attend the appointment  and remained unaware of Defendant Bullock's conclusions.

95.     Defendant Bullock conducted another clinical intervention with Mr. Amelia on April 7, 2023. Defendant Bullock reviewed the implications of the new diagnosis of a "personality disorder." Defendant Bullock told Mr. Amelia that his treatment would not include medication "at this institution." While she acknowledged that his symptoms were consistent with Intermittent Explosive Disorder, "there was no way" he could have such a disorder because it is such a rare diagnosis.

96.     In response, Mr. Amelia inquired about classes or programming he could take to manage his symptoms in lieu of medication. Defendant Bullock responded that while programming was available at USP Lee, Mr. Amelia would probably never get into psychology-based programming while at the institution.

97.     Between May and June 2023, Mr. Amelia's unit remained locked down for extensive periods of time. In addition to the consistent electronic cop-outs he had been submitting to Psychology Services from the end of January onwards, Mr. Amelia submitted a written cop-out for Defendant Bullock's attention on or around June 11, 2023. In the cop-out, Mr. Amelia requested to be seen to discuss the effects of the extended lockdowns on his mental health, as Mr. Amelia was concerned that he was seeing and hearing things that he knew could lead him to hurt himself or others.

98.     Despite submitting the request to Defendant Bullock, Defendant Wasim saw Mr. Amelia on June 12, 2023. Instead of taking Mr. Amelia to the Psychology Department, Defendant Wasim escorted Mr. Amelia into the Lieutenant's Office. Defendant Mitchell and approximately five other correctional officers were waiting in the office for Mr. Amelia.

99.     While in the Lieutenant's Office, Defendant Wasim and Defendant Mitchell provoked Mr. Amelia, so as to get him to "act out." Mr. Amelia was told to sit on a bench with

29

his hands behind his back.  He was further threatened that if he moved, the Defendants would "deal with it," insinuating that they would attack Mr. Amelia if he did.

100.    Further, Defendant Wasim told Mr. Amelia to forget about ever being placed back on his psychiatric medication at USP Lee.  Defendant Wasim cautioned Mr. Amelia that he could complain as high as the Mid-Atlantic Region, but that no one was going to do anything about the situation.

101.    Defendant Wasim and Defendant Mitchell then threatened to take Mr. Amelia to the SHU if he did not stop making requests to Psychology Services.  They said that with his references to potentially hurting people, they could place in him the SHU for 24, 48 or 72 hours, and facetiously assured Mr. Amelia that "no one would hurt him there."  Following this threat, one of the correctional officers instructed Mr. Amelia to "apologize" for even writing to Defendant Bullock about his various psychological issues and for not addressing her as "Dr. Bullock."[54]

102.    Following this interaction, Mr. Amelia wrote an apology cop-out to Defendant Bullock, as instructed.  He also continued to submit cop-outs to Psychology Services requesting to be placed in psychology-based programming to address his mental health.

**August 26, 2023 Assault and Placement in Four-Point Restraints**

103.    Still without his psychiatric medications or any other therapeutic intervention from Psychology Services, on August 26, 2023, Mr. Amelia experienced a psychotic episode.  During this episode, Mr. Amelia experienced both auditory and visual hallucinations.  Fearful that he may harm himself or his cellmate, Mr. Amelia pressed the emergency distress button in his cell to trigger a staff response.  In response to him pressing the emergency button, Mr. Amelia's cellmate threw Mr. Amelia onto the bottom bunk bed and began punching him in and around his head.

---

[54] Upon information and belief, Defendant Bullock did not have the title "Dr." in front of her name until at or around June 2023.  Prior to this date, Defendant Bullock was commonly referred to on the USP Lee compound as "Bullock."

104.    In response, Defendant Corbin and Unknown Transport Defendants approached Mr. Amelia's cell and sprayed both Mr. Amelia and his cellmate with pepper spray, also known as oleoresin capsicum ("OC") spray.   Following the issuance of OC spray, Mr. Amelia was handcuffed.  Shortly thereafter, the Unknown Transport Defendants walked Mr. Amelia out of the unit to get away from the fumes of the OC spray.   Once outside, the Unknown Transport Defendants slammed Mr. Amelia to the ground; a few seconds later, they pulled him off the ground and strapped him into a restraint chair.  Mr. Amelia was then wheeled away from his unit.  This is the last memory Mr. Amelia has until he awoke to the Unknown Four-Point Restraint Defendants slamming him with a riot shield as he lay strapped to a concrete block in four-point restraints.

105.    Once he woke up, Mr. Amelia realized that in addition to being restrained, he was wearing a helmet, and both his upper and lower extremities were numb.  As the Individual Unknown Four-Point Restraint Defendants went in and out of his cell, Mr. Amelia went in and out of consciousness.

106.    Although he cannot remember when the following instances of torture took place, Mr. Amelia recalls that, while he was in four-point restraints:

- An Unknown Four-Point Restraint Defendant placed two-pairs of handcuffs on his right wrist.

- An Unknown Medical Defendant pulled down his pants and poured an unknown liquid substance over his genitals.

- An Unknown Four-Point Restraint Defendant provided him "water" by means of filling up a blue latex glove with an unknown liquid and pouring the "water" into his mouth.

- An Unknown Medical Defendant broke several of Mr. Amelia's toes

31

during one of the "medical assessments."

- An Unknown Medical Defendant spit on Mr. Amelia while he lay in four-point restraints.

- Unknown Four-Point Restraint Defendants slammed his body multiple times with a riot shield with barbed wirelike prongs. On one instance, the riot shield was slammed and ripped across Mr. Amelia's face so hard that it ripped off half of his goatee.

- Unknown Four-Point Restraint Defendants forced Mr. Amelia to urinate on himself for nearly 72 hours.

107. At one point during the assault, Mr. Amelia recalls the Unknown Four-Point Restraint Defendants struggling to remove the double-handcuffs from his right wrist. Because the handcuffs were applied in such a way that their respective key holes were facing each other, staff had to use bolt cutters to remove Mr. Amelia's handcuffs. Mr. Amelia was then placed into ambulatory restraints with black-coated handcuffs and left to lay atop the concrete block where he remained conscious over a period of several hours.

108. When Mr. Amelia tried to get up to get a sip of water from the sink in his cell, he experienced a sudden, painful electrical shock from the handcuffs on his wrists. Mr. Amelia immediately laid back down on the concrete block and the shock stopped. Wondering if he had hallucinated this experience, a little while later, Mr. Amelia tried again to get some water, but he was shocked a second time.

109. Shortly thereafter, Defendant Mitchell and Defendant Logan Smith entered Mr. Amelia's cell. Defendant Mitchell positioned herself in front of Mr. Amelia's head, blocking the view of the camera that pointed into the cell, while Defendant Logan Smith approached

Mr. Amelia on his left side. Defendant Mitchell warned Defendant Logan Smith not to break Mr. Amelia's ribs. Heeding the warning, Defendant Logan Smith proceeded to repeatedly punch Mr. Amelia directly under his rib cage on the left side of his body.

110.    Following the repeated strikes to Mr. Amelia's left side, Defendant Mitchell referenced that this beating was "DP," which Mr. Amelia believed to represent a "disciplinary procedure," and that Mr. Amelia might sue the Defendants for the events that were transpiring. Officer Logan Smith then helped Mr. Amelia to his feet and moved him to an alcove in the room, out of view from the camera, and repeatedly slammed Mr. Amelia's head against the wall.

111.    At this point, Mr. Amelia gave up, and remained on the concrete block for until he was released from the ambulatory restraints several hours later.

112.    Upon information and belief, Mr. Amelia remained in either four-point or ambulatory restraints for a period of at least three days. When he was released from restraints, Mr. Amelia's injuries included cuts to his wrists and ankles; deep contusions and bruising to his left flank and left hip; severe pain in both shoulders and his head; three broken toenails; a broken right big toe; and increased fear, panic, and anxiety.

113.    For his trouble, Mr. Amelia was given two disciplinary infractions—a 201 (fighting with another person) and a 224 (assault on staff)—stemming from the psychotic episode he experienced on August 26, 2023.

114.    After these three days of torture and beatings administered in contravention of BOP policy, Mr. Amelia was placed back in a standard SHU cell on his unit on or around August 29, 2023. While in his cell, Mr. Amelia was so weak, he was unable to make it to the toilet, and was forced to defecate on himself. As a result, Mr. Amelia soiled his clothing.

33

115.    According to Mr. Amelia's medical records, Mr. Amelia was seen by Defendant Bullock on August 29 after she was allegedly alerted by correctional staff on Mr. Amelia's unit who were allegedly "concern[ed] over [Mr. Amelia's] mental health over the last several days."

116.    When Defendant Bullock approached Mr. Amelia's cell on the morning of August 29, she inquired whether Mr. Amelia wanted to get back on his medication in order to sell it to other residents.  Dissatisfied with Mr. Amelia's answer of "no," Defendant Bullock further inquired whether Mr. Amelia had been "shooting suboxone," to which he again answered, no. Additionally, Defendant Bullock offered her condolences to Mr. Amelia for his time in the SHU as she had apparently been preparing to put him in for a program transfer.

117.    However, in her report of this encounter, Defendant Bullock concluded that Mr. Amelia's "concern[ing behavior]" is "more indicative of substance use and substance use withdrawal than a psychotic episode," and further claimed that Mr. Amelia admitted to using K2 and suboxone on multiple occasions within the past week.  She also reported that Mr. Amelia allegedly admitted to having conflict with his previous cellmate because he "owes a few bills" to his peers and is "willing to put in . . . work."

118.    Mr. Amelia never had a conversation like that presented in Defendant Bullock's clinical report dated August 29, 2023.  This representation of the scope of this encounter is falsified.

**Torture, Trauma, and Injuries Following the August 26, 2023 Assault**

119.    Immediately following the brutal three-day assault of Mr. Amelia, the Individual Defendants strategically attempted to cover-up or otherwise launder their abuse of Mr. Amelia.

120.    On August 30, 2023, Mr. Amelia was taken to the B-unit showers with the rest of his unit by Officer Gambrel and Officer Mabe.  The officers were adamant that Mr. Amelia get in

34

the showers because he smelled so bad after defecating and urinating on himself over the course of the past three days.

121.    Once in the shower, Mr. Amelia came to realize that his arms and hands were not functioning normally.  Mr. Amelia came to realize that he was unable to raise arms above his elbows or grasp anything with his hands, making it impossible to bathe himself.  Mr. Amelia called out for help.

122.    Soon thereafter, Officer Mabe responded, and Mr. Amelia asked to be taken to medical.  In response, Officer Mabe insisted that Mr. Amelia shower.  To satisfy his order, Mr. Amelia stood under the flowing water of the shower head, but was unable to meaningfully cleanse his body.

123.    After the passage of some time, Mr. Amelia again pleaded with Officer Mabe to be taken to medical.  Noticing the extent of Mr. Amelia's handicap, Officer Mabe helped Mr. Amelia get dressed through the metal bars that surrounded the exterior of the shower.

124.    To Mr. Amelia's surprise, an additional five correctional officers, including Defendant Sluss, arrived at the showers.  Defendant Sluss then proceeded to escort Mr. Amelia off the unit to what Mr. Amelia perceived was Health Services for an examination of his injuries.

125.    As Defendant Sluss and Mr. Amelia were walking, it became clear to Mr. Amelia that he was not in fact being taken for a medical examination and was instead being taken to the Lieutenant's Office.  Having remembered his prior conversation with Defendant Mitchell and Defendant Wasim in this very same room, Mr. Amelia pulled back from Defendant Sluss.  In response, Defendant Sluss slammed Mr. Amelia up against an exterior wall.

126.    In response, the Unknown SHU Defendants and Defendant Sluss proceeded to further assault Mr. Amelia, including hitting Mr. Amelia's face and head.  At one point during the assault, Mr. Amelia lost consciousness.

127.    For this interaction, Mr. Amelia was issued two disciplinary infractions— a 203 (threatening bodily harm) and a 224 (assault on staff).

128.    After regaining consciousness, Mr. Amelia awoke in a dry cell[55] in the SHU where he was housed from August 30, 2023 through September 6, 2023.

129.    On or around the morning of August 30, 2023, Defendant Wasim approached Mr. Amelia's cell and  asked him what he had eaten for breakfast.  Mr. Amelia answered that he had eaten cereal, despite not having consumed any food due to his limited mobility.  Without further question, Defendant Wasim walked away from Mr. Amelia's cell.  This was the only time Defendant Wasim met with Mr. Amelia while he was in the SHU.

130.    Defendant Wasim categorized this brief interaction with Mr. Amelia as a "24-hour restraint review," with the review period ranging from August 30, 2023 at 5:40 p.m. to August 31, 2023 at 5:40 p.m.  The note in Mr. Amelia's medical record further indicates Mr. Amelia appeared "to be best managed through sound correctional interventions."  However, Mr. Amelia was never in four-point restraints on either August 30 or 31.  Upon information and belief, the details of this report by Defendant Wasim are completely falsified.

131.    During his time in the dry cell, Mr. Amelia continued to suffer from the extent of his injuries that arose from torturous acts of the Individual Defendants from August 26 through August 29.

---

[55] A dry cell is a type of holding cell.  Within the cell, there is a toilet and sink, but correctional staff can control the flow of water to these appliances.

132.   Presumptive nerve damage from this assault in four-point restraints made it difficult for Mr. Amelia to walk, stand up, or move his arms.  These limitations not only forced Mr. Amelia to have to shuffle around the cell on his knees, but his limited dexterity also made it nearly impossible to carry a food tray or feed himself.  Making matters worse, each time Defendant Robbins or other correctional staff delivered food to Mr. Amelia, they either threw the tray into the cell or otherwise let it fall because Mr. Amelia could not grasp the tray.

133.   On an unknown date, Defendant Robbins ordered Mr. Amelia to eat some of the food that he had thrown into the cell.  During this instance, Mr. Amelia was forced to take a bite of potatoes that were scattered across his cell floor to please Defendant Robbins.  The bite of potato that Mr. Amelia took indeed had a rock in it.

134.   As a result of his physical limitations, Mr. Amelia began to lose an unhealthy amount of weight, and his knees became covered in open abrasions that turned red, swollen, flaky, and warm to the touch over the next seven days.

135.   Rather than alerting medical staff to the extent of Mr. Amelia's injuries, Defendant Robbins continued his torture of Mr. Amelia by banging on the glass of Mr. Amelia's cell and yelling at Mr. Amelia to get up and walk despite knowing he could not.

136.   Defendant Bradburn also came by Mr. Amelia's cell from time to time, sometimes making an effort to occasionally remove the top of Mr. Amelia's food tray to "assist" him in consuming his food.  Additionally, Defendant Bradburn, Defendant Thompson, Defendant Robbins, and the Unknown SHU Defendants made it a point also to verbally harass Mr. Amelia during his duration in the dry cell.  These Defendants would often make references to Mr. Amelia's declining health, insinuating that he looked like he belonged in Auschwitz.

37

137.    On September 6, 2023, Defendant Glass escorted Mr. Amelia to a disciplinary hearing for several of Mr. Amelia's fabricated disciplinary infractions.  On the way to the hearing, he told Mr. Amelia to "keep your head up, you did nothing wrong."

138.    Upon entering the DHO hearing, Mr. Amelia noticed that Defendant Bradburn was already in the room waiting.  Defendant Bradburn further instructed Mr. Amelia to say no comment and plead guilty when asked by the DHO hearing officer.  Out of fear of further torture, Mr. Amelia abided by Defendant Bradburn's instructions and was found guilty of both disciplinary infractions.

139.    Following the hearing, Defendant Bradburn moved Mr. Amelia into a new SHU cell with a new resident on D-block.  As he entered the cell, Mr. Amelia heard Defendant Bradburn work out a "deal" with Mr. Amelia's new cellmate.  The deal consisted of Defendant Bradburn seeing that Mr. Amelia's cellmate would be afforded additional privileges, such as books and additional time on the phone, in exchange for assaulting and torturing Mr. Amelia.

140.    Mr. Amelia's new cellmate followed Defendant Bradburn's directives, and would torture Mr. Amelia over the course of the next 13 days.  Mr. Amelia's cellmate proceeded to physically attack him by smothering him with blankets, clothing, a sheet rope, and eventually, his hands, until Mr. Amelia lost consciousness.  These assaults took place every day, typically occurring between the times following breakfast and just before lights out.  In an effort to try and avoid the abuse, Mr. Amelia would often pretend to be asleep during both days and nights, for it was only when he was asleep that his cellmate would refrain from attacking him.

141.    In a series of Jekyll and Hyde moments, Mr. Amelia's cellmate would also assist Mr. Amelia with basic tasks, such as eating, showering, and dressing himself.  This aspect of the relationship added to the psychological torture Mr. Amelia endured during the time—Mr. Amelia

never knew what version of his cellmate he was going to get, and Mr. Amelia was so incapacitated that he began to develop bedsores from constantly lying down.

142.    USP Lee staff adopted a storyline to further the extent of this aspect of Mr. Amelia's torture, alleging and announcing to other residents on the range that Mr. Amelia and his cellmate were "lovers" and were on their honeymoon together.  This story even translated into Defendant Sareena Scott bringing Mr. Amelia's cellmate fake pill slips with the name "Honeymoon" in place of his real name to poke "fun" at the situation.  This practice also allowed Mr. Amelia's cellmate to keep track of the number of days that he had left on his stay in the SHU, which upon information and belief, was also coordinated by Defendant Bradburn.

143.    Amidst all the chaos, Mr. Amelia continued to suffer from the injuries from his time in four-point restraints.   In fact, Mr. Amelia's pain began to localize on the left side of his body. Mr. Amelia experienced severe pain related to the nerve damage in his left shoulder, sharp pain in his left hip, and the discomfort of a hole that had developed from the open abrasions left by the restraints on his left ankle.  Additionally, the open abrasions to Mr. Amelia's knees from crawling around the dry cell remained swollen, red, flaky, and warm to the touch.

144.    On an unknown day, and without formal request, Defendant Sareena Scott approached Mr. Amelia with a bottle of an unknown medication that she further instructed Mr. Amelia to take.  The bottle of medication did not have Mr. Amelia's name on it, nor did Defendant Sareena Scott make any attempt to describe what the medication was for to Mr. Amelia.

145.    Over the course of the next few days, Mr. Amelia's cellmate proceeded to administer the unknown medication to Mr. Amelia.   There were some instances where Mr. Amelia's cellmate provided Mr. Amelia with a singular pill, and then others where he would force Mr. Amelia to take five or six pills at one time.

39

146. On or around September 9, 2023, Defendant Sareena Scott allegedly saw Mr. Amelia regarding reported "left knee pain." According to Defendant Sareena Scott's clinical notes, Mr. Amelia's left knee was enlarged with large amounts of redness and Mr. Amelia's left ankle had scabs with a moderate amount of yellowish discharge. Defendant Sareena Scott concluded that Mr. Amelia was suffering from an infection; she allegedly administered an IV flush with sodium chloride, and prescribed a ten-day supply of Bactrim. Mr. Amelia has no recollection of this encounter occurring.

147. On or about September 12, 2023, Mr. Amelia was pulled into the medical room in the SHU for an examination. Once in the medical room, Mr. Amelia took notice to the fact that Defendant Robbins was also in the room.

148. During her "examination" of Mr. Amelia, Defendant Sareena Scott pretended to take Mr. Amelia's vitals using a toy stethoscope while Defendant Stuart Scott quickly hooked Mr. Amelia up to an IV. Unsure of what the fluid was that was going into his body, let alone the reason behind said liquid being administered from a piece of foil, Mr. Amelia pleaded with both Defendant Sareena Scott and Defendant Stuart Scott to examine the hole that had developed in his left ankle.

149. Shortly thereafter, Defendant Sareena Scott proceeded to examine the hole in Mr. Amelia's left ankle. While doing so, Defendant Sareena Scott squeezed the surrounding area of the wound, and green liquid began to ooze out of the hole in Mr. Amelia's left ankle. Defendant Sareena Scott laughed and said to Mr. Amelia, "you might lose a leg."

150. At an unknown point during the "examination," Defendant Robbins smacked Mr. Amelia in the face and told him that he owed Lieutenant Corbin an apology for "spitting" on

40

his face.[56]  One of the Unknown SHU Defendants then spit in Mr. Amelia's face and told him not to wipe it off his face when he got back to his cell, causing the other Defendants in the room to laugh.

151.   Defendant Robbins then took things a step further, and taunted Mr. Amelia, calling him a "nigger lover from Michigan."  He then began to sing an unknown country song, asking Mr. Amelia if he had any thoughts about the color of Reba McIntire's pubic hair.

152.   Without mention of Defendant Robbins's actions during this alleged medical encounter, Defendant Sareena Scott nonetheless failed to provide any form of treatment for the injury to Mr. Amelia's left ankle or the bedsores that had developed on Mr. Amelia's back. Following the administration of the unknown IV fluid from Defendant Stuart Scott, Mr. Amelia felt even more dehydrated that he already had been prior to this interaction.

153.   A few days later, Mr. Amelia's cellmate had him in a chokehold and was squeezing so intensely that when he heard a "click" of Mr. Amelia's teeth, he mistakenly thought he had just snapped Mr. Amelia's neck and killed him.  His cellmate was so spooked that he released his grasp of Mr. Amelia's throat.

154.   A day or so later, on September 19, 2023 Mr. Amelia's cellmate received a kyte— a note—from other individuals from Mr. Amelia's former unit who had heard what Mr. Amelia's cellmate was doing to him.  In response to the kyte, Mr. Amelia's cellmate yelled down the SHU range that he was "ABT" and "he didn't give a fuck," as to whatever message was contained within the kyte.

---

[56] At this point in time, Mr. Amelia was unaware what Defendant Robbins was referring to, but came to realize that Defendant Robbins was referring to the events that took place on August 26, 2023 when Mr. Amelia was being removed from his cell after staff dispensed OC spray on Mr. Amelia and his cellmate.

155.    The following day, September 20, 2023, Mr. Amelia's cellmate assaulted him one last time.  Once he had enough, and without explanation, Mr. Amelia's cellmate proceeded to lie on his bunk while Mr. Amelia lay curled up on the floor.  Once Defendant Thompson walked by and saw the situation within Mr. Amelia's cell, Defendant Thompson pulled Mr. Amelia's cellmate from the cell, and then alerted certain Individual Defendants to remove Mr. Amelia from the cell.  Defendant Thompson then led Mr. Amelia to the medical room in the SHU where he was met by Defendant Ashley, Defendant Sareena Scott, and the Unknown SHU Defendants.

156.    Defendant Sareena Scott summarized the September 19, 2023 interactions in Mr. Amelia's medical record by stating that her examination stemmed from an alleged report that Mr. Amelia claimed that he had fallen off the toilet.  She also noted that Mr. Amelia had a small laceration on a left toe, as well as bloody drainage on the face and a small superficial laceration under his right eye.  In response, Defendant Sareena Scott allegedly acted to address these injuries by applying a sterile strip to the toe and noted dried blood on the left side of Mr. Amelia's head.  At no point during this interaction did Mr. Amelia  receive a sterile strip for an injury on his left toe.

157.    Following this encounter, Defendant Thompson escorted Mr. Amelia to a holding tank in the SHU to change his clothes.  When questioned by Defendant Thompson as to what happened, Mr. Amelia told Defendant Thompson that his injuries were the result of a fall off a toilet.  When Defendant Thompson relayed that Mr. Amelia's cellmate had said that he beat Mr. Amelia, Mr. Amelia stated, "if that's what he said, go ahead and go with whatever he said."

158.    Upset by Mr. Amelia's lack of a response, Defendant Thompson failed to assist Mr. Amelia to get dressed, forcing Mr. Amelia to crawl around the cell floor to get dressed.  Defendant Thompson then called Mr. Amelia a "snitch" and the Unknown SHU Defendants, none

of whom were wearing tame tags, began to bang Mr. Amelia's head off the wall of the holding tank while he was handcuffed behind his back—and this time without a helmet.

159.    Once their attack subsided, the Unknown SHU Defendants then dragged Mr. Amelia to another SHU cell on C-range.

160.    On the morning of September 20, 2023, Mr. Amelia called out to Defendant Ashley, who was doing his daily rounds in the SHU, for assistance.  Once at his cell door, Mr. Amelia proceeded to show Defendant Ashley the holes in his left wrist and left ankle.  Without anything other than glaring at Mr. Amelia's injuries, Defendant Ashley informed Mr. Amelia that he was fine and that his wounds just needed time to heal.

161.    Later that day, Defendant Bradburn escorted Mr. Amelia to his DHO hearing for the disciplinary infractions he received on August 26, 2023.  Once in the DHO room, Defendant Bradburn instructed Mr. Amelia to plead guilty to the charges and not to make any comments to the hearing officer.  Mr. Amelia complied with Defendant Bradburn's directions.

162.    Following the hearing, Defendant Nancy Smith conducted a clinical encounter to follow up on the completion of the ten-day course of Bactrim.  During the course of the encounter, Defendant Nancy Smith noted that Mr. Amelia did not complain of any further pain or injury, but she observed bruises, scratches, and swelling in both of Mr. Amelia's knees.  Defendant Nancy Smith further noted that Mr. Amelia appeared very thin and weak.

163.    In its totality, Defendant Nancy Smith's exam documented the following:  bruising and contusions behind and in the left ear; bruising across Mr. Amelia's face; an abrasion on the top left side of Mr. Amelia's head that was beginning to scab; dried blood in the nasal area as well as abrasions and scratches across Mr. Amelia's nose and forehead; a small cut on the upper lip that was scabbing, as well as lower lip dryness with peeling; bruising on the anterior left upper chest;

43

the ability to visualize and palpitate Mr. Amelia's ribs due to decreased BMI; dry, scaly skin on the wrists with scabbing; bruising on the left flank; skin being flush; abrasion on the left great toe; and moderate swelling in the left knee with dry; scaly skin that was flaking off.

164.    Despite her detailed notes of the extent of Mr. Amelia's injuries, Defendant Nancy Smith provided no form of care to Mr. Amelia on this date, and instead told him to keep drinking water.

165.    Additionally, Defendant Nancy Smith's report further alleges that during the September 20, 2023, interaction, Mr. Amelia indicated that he did not previously fall off of the toilet as was reported on September 19, and when Defendant Nancy Smith asked if he was in an altercation with his cellmate, Mr. Amelia confirmed that he had been.  According to Defendant Nancy Smith's notes, Mr. Amelia was reluctant to speak to her.  This conversation, however, never took place, and Mr. Amelia spoke nothing of the altercation with his cellmate or the prior day's encounter with medical staff.

166.    On or around September 21, 2023, Defendant Bradburn again placed Mr. Amelia into a new cell with a new cellmate.  Once in the new cell with the new cellmate, Defendant Bradburn addressed both Mr. Amelia and his cellmate, calling them both "check-in bitches." Defendant Bradburn further instructed Mr. Amelia's cellmate to "take care" of Mr. Amelia or face the consequences.

167.    Despite Defendant Bradburn's instructions, Mr. Amelia's cellmate did not physically harm Mr. Amelia, at least not at first.  Instead, his cellmate assisted Mr. Amelia in showering, eating, and dressing without recourse.

168.    A few days after being placed in the cell with his new cellmate, Mr. Amelia's cellmate was taken to medical for his own evaluation.  While there, Mr. Amelia's cellmate made

44

Defendant York aware of the extent of Mr. Amelia's injuries, and pleaded for medical attention for Mr. Amelia.

169.    Shortly thereafter, on or around September 25, 2023, Defendant Bradburn escorted Mr. Amelia to receive x-rays.  Mr. Amelia received at least fifty x-rays of his abdomen, his left spine, his cervical spine, his facial bones, his knees, and his chest.  The x-rays revealed a round calcific density in the interior left lower pelvis, as well as soft tissue swelling surrounding the left knee.  Because Mr. Amelia was so weak and had limited mobility in his upper extremities, Defendant Bradburn was forced to put on the lead protector smock traditionally worn when receiving an x-ray and hold Mr. Amelia's arms up for the entirety of the administration of the x-rays.

170.    Two days later, on September 27, 2023, Defendant Nancy Smith and Nurse Baker conducted a clinical encounter to follow up on Mr. Amelia's "right"[57] shoulder pain, as well as the weakness, fatigue, and intermittent dizziness that Mr. Amelia was experiencing.  Despite consistently telling Defendant Nancy Smith that the pain was in his left shoulder, Defendant Nancy Smith ordered an x-ray of Mr. Amelia's right shoulder to check for dislocation and additional lab work.  Upon examination, Defendant Nancy Smith noticed that there was also swelling in Mr. Amelia's left knee.

171.    On this same day, and as a treatment plan for Mr. Amelia's rampant weight loss, Defendant Nancy Smith put in orders to ensure that Mr. Amelia would receive a 1,000 mL sodium chloride flush three times a week.

172.    Defendant Smith's September 27, 2023 report also mentions that she intended to put in orders to make sure Mr. Amelia received one Ensure during both the morning and evening

---

[57] Note, Defendant Smith's report states that she was following up on Mr. Amelia's right shoulder pain when in actuality, Mr. Amelia's left shoulder was the limb he reported having pain in.

pill lines.  Despite Defendant Nancy Smith's orders, Mr. Amelia began receiving two Ensures with every meal, totaling 6 Ensures a day.

173.    During Defendant Smith's encounter with Mr. Amelia, the hole in Mr. Amelia's left ankle was measured.  It was concluded that the hole was an inch and a quarter wide in diameter.

174.    Following her evaluation of Mr. Amelia, Defendant Nancy Smith noted that she "called and discussed" Mr. Amelia's condition with "MD."  Upon information and belief, the "MD" referenced is Defendant York.  Defendant Nancy Smith's notes indicate that the "MD" did not believe that Mr. Amelia needed to be taken to the emergency room at that time.  Additionally, the report indicates that Defendant Nancy Smith and the "MD" agreed that Mr. Amelia should receive an oral examination to ensure that there were no dental-related issues preventing him from eating, as well as a consultation from Psychology Services to evaluate whether Mr. Amelia was engaging in a hunger strike.

175.    After his encounter with Defendant Nancy Smith, the dentist on staff at USP Lee came into the medical room where Mr. Amelia was receiving an IV treatment.  The dentist performed an exam of Mr. Amelia's mouth, and concluded that Mr. Amelia was not currently suffering from an oral infection or any other ailment that would prevent him from eating.

176.    Defendant Bullock also conducted a clinical intervention with Mr. Amelia on September 27, 2023.  In her recount of the interaction, Defendant Bullock claimed that Mr. Amelia denied being the victim of a traumatic event and said he felt better after being placed in the SHU.  In reality, Mr. Amelia made no such assertion.

177.    Defendant Bullock asked whether Mr. Amelia had been the victim of a sexual assault, to which Mr. Amelia responded that he had not.  However, Mr. Amelia did express an interest in speaking with Defendant Bullock about something else, but he would prefer to do so in

private being that Defendant Sareena Scott was also in the room during the conversation.  Rather than asking Defendant Sareena Scott to leave the room, Defendant Bullock proceeded with her assessment of Mr. Amelia.

178.    During his conversation with Defendant Bullock, Mr. Amelia inquired about reinstating the prescriptions for his psychiatric medications.  Defendant Bullock's report of her interaction with Mr. Amelia on this date mentions nothing about this request, but rather includes a note summarizing Defendant Bullock's instruction that Mr. Amelia focus on improving his physical health before engaging in psychology-based programming.  Mr. Amelia had no further interactions with Psychology Services at USP Lee following this encounter.

179.    Following the events of September 27, 2023, and through mid-November 2023, Mr. Amelia was seen by someone in medical approximately every other day for dressing changes for the injury to his left ankle and the bedsores on his back—the injuries to his ankle and back that he sustained during the four-point restraint assault in August 2023 and its September aftermath.

180.    Often, Defendant Baker was responsible for changing Mr. Amelia's dressing changes on both his left ankle and the bedsores on his back.  Nurse Baker would change Mr. Amelia's ankle dressing every other day, and the bedsore dressing was changed approximately every three days.

181.    On no more than three occasions during these encounters, Mr. Amelia would also receive IV fluids.  However, the administration of the IV fluids was never consistent, and Mr. Amelia was not always administered the entirety of the 1000 mL bag.  Additionally, the frequency in which Mr. Amelia received the fluids was converse to Defendant Nancy Smith's September 27 orders that Mr. Amelia be administered fluids intravenously three times per week.

47

182.    Despite the frequency of Mr. Amelia's interactions with medical, as well the entirety of the time Mr. Amelia was held hidden in the SHU following the events of August 30, 2023, medical staff failed to administer Mr. Amelia's albuterol inhaler, the omeprazole for his gastrointestinal issues, as well as his cholesterol medication—all medications which Mr. Amelia held active prescriptions for at USP Lee.

183.    Despite the frequent medical interactions, at least one course of Bactrim and six Ensures per day, Mr. Amelia's weight and strength continued to decline.

184.    On October 8, 2023, the dentist who had initially examined Mr. Amelia on September 27, 2023 returned to see Mr. Amelia while he was in medical with Defendant Sareena Scott.  During this visit, the dentist took pictures of Mr. Amelia's wounds on his left ankle[58] as well as the bed sores on his back.  The dentist further assured Mr. Amelia that the pictures he took would be sent to Nurse Baker for further treatment.

185.    On or about October 25, 2023, Mr. Amelia was taken to another disciplinary hearing for the alleged 203 incident report (threatening bodily harm) that he received on August 30, 2023.  In an attempt to defend himself of these accusations, Mr. Amelia called Defendant Gambrel as his staff witness to speak to Mr. Amelia's medical emergency on the date of the alleged incident.  Instead of speaking to what happened that day, Defendant Gambrel shifted his recollection of the events to turn against Mr. Amelia.

186.    In addition, Lieutenant Parsons, who was also present during the DHO hearing, told the DHO hearing officer that Mr. Amelia was waiting for a bed at a medical facility to become available, and then urged Mr. Amelia to plead guilty to the charges so that he could be transferred

---

[58] According to the defendants, the hole on Mr. Amelia's left ankle had reduced from approximately 1.25 inches to about the diameter of a nickel.  Upon information and belief, while the dentist took these photos, Defendant Sareena Scott positioned the ruler measuring the hole in Mr. Amelia's left ankle in such a way to make it seem as if the diameter of the hole had reduced.  The hold in Mr. Amelia's left ankle never reduced to the size of a nickel.

48

to a medical facility sooner. Mr. Amelia indeed pleaded guilty to the accusations in hopes that he would be transferred to a medical facility that could provide him with the care he needed.

187. On or about November 3, 2023, Defendant Robbins, Counselor Pollard, Defendant Logan Smith, and an Unknown SHU Officer escorted Mr. Amelia to a visit with undersigned counsel. For the visit, Mr. Amelia brought with him an envelope containing a statement by Mr. Amelia's then-current cellmate that confirmed Mr. Amelia's declining health and his physical appearance when they became cellmates on or about September 21, 2023.

188. Prior to being taken to speak with undersigned counsel, Mr. Amelia waited in a holding cell near the visiting room holding onto his legal documents. There, Defendant Robbins took the envelope containing Mr. Amelia's legal documents and started specifically to review the document from his cellmate, despite Mr. Amelia telling Defendant Robbins that the documents were intended for his lawyers' eyes only.

189. Once Mr. Amelia was escorted from the SHU to the visiting room, Defendant Robbins was told staff did not need him any longer, and upon information and belief, Defendant Robbins returned to the SHU.

190. After the legal visit concluded, Mr. Amelia returned to his same SHU cell. At that time, Mr. Amelia's cellmate informed Mr. Amelia that Defendant Robbins had confronted him with the contents of the letter he had read while Mr. Amelia was visiting with his attorneys. Mr. Amelia's cellmate further communicated that Defendant Robbins instructed him to put Mr. Amelia through "bootcamp" and expected him to assault and torture Mr. Amelia. Further, because of the leverage Defendant Robbins had by reading his letter, Mr. Amelia's cellmate had to comply with the orders to harm Mr. Amelia. Mr. Amelia's cellmate then stepped into the role that his prior abusive cellmate once held and began beating and torturing Mr. Amelia in their cell.

The torture and abuse also included Mr. Amelia's cellmate stealing his food and Ensures, further contributing to Mr. Amelia's loss of weight and strength.

191.    The abuse continued for over a week until on or around November 11, 2023 when Defendant Corbin removed Mr. Amelia's cellmate for an unknown reason.  A day or two later, a new resident was placed in the cell with Mr. Amelia.

192.    Shortly after being placed in the cell, Mr. Amelia's new cellmate noticed that Mr. Amelia was in severe pain and needed medical attention.  At this point, Mr. Amelia could not walk, and Mr. Amelia's left hip had a bump swollen to the size of a softball.  This had been like this for a few weeks, but the medical staff had so far refused to examine it despite their frequent interactions with Mr. Amelia at this point in time.

193.    On or about November 14, 2023, after being flagged by Mr. Amelia's cellmate, Defendant Ashley stopped at the door of Mr. Amelia's cell.  Not bothering to open the cell door, Defendant Ashley peered through the window of the cell as Mr. Amelia's cellmate pulled the left side of Mr. Amelia's pants down to show Defendant Ashley the injury on Mr. Amelia's left hip.

194.    After Defendant Ashley saw Mr. Amelia's hip, PA Stevens[59] also came to look at Mr. Amelia's hip through the cell window.  Upon seeing the extent of Mr. Amelia's injury, PA Stevens pulled Mr. Amelia out of the cell, placed him in wheelchair, and rushed him to medical for further assessment.  Once in medical, PA Steves and Defendant Ashely did an assessment of Mr. Amelia.  PA Stevens concluded that Mr. Amelia needed to be transported to the emergency room.

195.    While waiting for the ambulance to arrive, Defendant Bradburn walked into the medical room where Mr. Amelia was waiting.  Once there, Defendant Bradburn, who upon

---

[59] Upon information and belief, PA Stevens is a Physician's Assistant at USP Lee.

information and belief, had been orchestrating the attacks by Mr. Amelia's cellmates, all of a sudden acted concerned for the state of Mr. Amelia's injuries. Defendant Bradburn took it as far as even asking Mr. Amelia who caused his injuries. Mr. Amelia did not engage with Defendant Bradburn's commentary and continued to wait for help to come.

196. That evening, Mr. Amelia was transported to the Lee County Emergency Room.

197. After arriving at the emergency room, Mr. Amelia was told that he would need a blood transfusion, and that Lee County Hospital was not able to treat the extent of Mr. Amelia's injuries appropriately. As a result, Mr. Amelia was transported to Holston Valley Medical Center in Kingsport, Tennessee.

198. Mr. Amelia arrived at Holston Valley early in the early morning of November 15, 2023, and stayed in the hospital for three days, through his discharge on November 17, 2023. Upon his arrival on November 15, Mr. Amelia was assessed to need a variety of lab tests as well as a CT scan to better assess his hip injury.

199. Per the results of his CT scan, Mr. Amelia had multiple hematomas in his left hip joint that exhibited signs of superinfection and septic arthritis. However, Mr. Amelia was not told anything about an infection, and was only told he would need emergency surgery on his left hip to address his current pain.

200. Following the delivery of this news, the Unknown Hospital Defendants began to interfere in Mr. Amelia's medical care. Mr. Amelia was prevented from speaking directly with the hospital medical staff, and the Unknown Hospital Defendants instead handled all communications related to Mr. Amelia's care at Holston Valley.

201. This interference eventually led Mr. Amelia's care team at Holston Valley to deliver an entirely new assessment of Mr. Amelia's injuries on November 16, 2023, an assessment that

51

contradicted the earlier expressed need for emergency surgery. Mr. Amelia was now told that rather than needing surgery to address the injury to his hip, Mr. Amelia's hip was simply bruised and just needed time to heal. He was told he could use a walker until the pain in his hip subsided.

202.   After the switch in his treatment plan, and without further explanation, staff at the hospital inserted "staph gel" into Mr. Amelia's nose. Mr. Amelia was not offered an explanation as to why he was receiving this form of treatment, and the treatment staff failed to mention that Mr. Amelia had any form of infection at all—let alone a staph infection.

203.   In preparation for Mr. Amelia's discharge, but without further explanation to Mr. Amelia, the doctors at Holston Valley ordered several medications, including: 1) Tylenol and ibuprofen (for pain management), 2) Senokot (a laxative), 3) Robaxin (a muscle relaxer), 4) Venelex ointment (for wound care), and 5) Zofran (for nausea).

204.   The discharge treatment also included the linked treatment of sodium chloride and Bactroban ointment 2% for MRSA[60] decolonization. Holston Valley staff also recommended Mr. Amelia supplement his nutrition with extra nutritional shakes.

205.   Mr. Amelia was discharged from Holston Valley Medical Center on November 17, 2023 and returned to USP Lee. Upon his arrival to USP Lee, Mr. Amelia was provided with a wheelchair despite the hospital's suggestion that he use a walker for assistance. Mr. Amelia was informed by Defendant Stuart Scott that he would not receive a walker and needed to use the wheelchair as a walker instead.

---

[60] Methicillin-resistant Staphylococcus aureus (MRSA) is an infection caused by a particular type of staph bacteria that has become resistant to multiple strains of antibiotics that have traditionally been used to treat ordinary staph infections. In general, staph infections, including MRSA, start as swollen, painful, red bumps, that may feel warm to the touch, be full of pus or other drainage, and may be accompanied by a fever. These bumps can turn quickly into deep, painful abscesses that can burrow deep into the body, causing potentially life-threatening infections in one's body, including in bones or joints. *See MRSA infection*, Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/mrsa/symptoms-causes/syc-20375336 (last visited Oct. 9, 2024).

206.    Additionally, once back at USP Lee, Mr. Amelia never received the follow-up treatment for MRSA and was never told about the additional instructions from the hospital.  In fact, Defendant Stuart Scott, who allegedly reviewed Mr. Amelia's discharge orders, noted that there were "no changes made" to Mr. Amelia's medications or diet, he should use a walker for assistance, and take Tylenol/ibuprofen for pain.

207.    After returning from the hospital, Mr. Amelia was not provided with any Tylenol/ibuprofen to help manage his pain.  Instead, he was told by Defendant Stuart Scott that he would need to purchase these medications from the commissary.  Additionally, Mr. Amelia was not provided with any additional Ensures to supplement his diet, though he continued to receive the six Ensures per day he had received prior to his trip to the hospital.

208.    Only after a few days of being back at USP Lee, Mr. Amelia's pain became so severe that he was unable to use the wheelchair as a walker any longer.  As such, Mr. Amelia was forced to sit in the wheelchair to move around.  Mr. Amelia has been confined to a wheelchair ever since.

209.    Approximately ten days after being discharged from the hospital, Mr. Amelia submitted a BP-8 to medical staff due to elevated concerns for his pain.  He specifically asked medical staff to provide him with ibuprofen as opposed to him having to order the medication through commissary.

210.    On the same day, November 27, 2023, following Mr. Amelia's submission of a BP-8, Mr. Amelia also sent a cop-out to PA Stevens explaining that he was still in pain and asking to be seen.  Following the cop-out, PA Stevens had a clinical encounter with Mr. Amelia.  After his assessment, PA Stevens concluded that he did not see any "obvious" indication of infection, and

53

prescribed prednisone to help with the swelling in Mr. Amelia's hip, as well as ibuprofen to help manage his pain.

211.    Several days later, Mr. Amelia's cellmate, who was tasked by Defendant Bradburn to care for Mr. Amelia's ailments, flagged down Defendant Robbins to take Mr. Amelia to medical. When Defendant Robbins approached the cell, he stated, "the only person coming to see [Mr. Amelia] is the grim reaper once [he] dies."

212.    On or about December 12, 2023, Defendant Thompson removed Mr. Amelia from his cell, placed him in a SHU holding cell, and told him that he was going to be transferred to USP Hazelton.    Defendant Thompson further informed Mr. Amelia that USP Hazelton was not a medical facility and would be worse than USP Lee.    He further instructed Mr. Amelia to "have fun" at USP Hazelton and the staff at USP Lee still loved him.

213.    After several hours in the SHU holding cell, Mr. Amelia was told to get dressed, but Mr. Amelia was unable to put a sock or shoe on his left foot due to the pain in his left ankle.

214.    After he was dressed, and without a sock on his left foot, Mr. Amelia was then taken to R&D.    When he was picked up, an officer had to help Mr. Amelia put on his left shoe.    The officers there told Mr. Amelia to get out of the wheelchair and walk, and after several attempts at walking, the officers were satisfied that Mr. Amelia was unable to walk on his own and carried Mr. Amelia onto the transport bus.

215.    Mr. Amelia arrived at now-FCI Atlanta on or around December 12, 2023 and was then transferred to FTC Oklahoma City on January 1, 2024.    At both facilities, Mr. Amelia sought medical attention, including, among many things, requests to be provided with his daily Ensures, his psychiatric medication, and x-rays.    Rather than providing Mr. Amelia with any assistance,

54

staff at both FCI Atlanta and FTC Oklahoma told Mr. Amelia that he would need to wait to reach his final destination before he could receive any form of medical attention.

216.    On or about January 8, 2023, Mr. Amelia arrived at USP Hazelton, where he was given a wheelchair and placed in a handicapped cell.

217.    On or about January 12, 2024, Mr. Amelia spoke to medical staff at USP Hazelton about receiving his psychiatric medications, as well as treatment for the severe pain he was still experiencing in his left hip.  Mr. Amelia was told he would be seen, and his concerns would be addressed in due time.

218.    On or about January 27, 2023 and January 28, 2023, Mr. Amelia pushed the emergency button in his cell to request correctional staff alert medical staff of his condition. Despite being in extreme pain, Mr. Amelia was threatened by the responding correctional staff with placement in the SHU if he continued to complain about his pain.

219.    Finally, on January 29, 2024, Mr. Amelia met with Dr. Mims from Health Services at USP Hazelton.  A short time into his assessment, Dr. Mims determined that Mr. Amelia needed to go to the hospital.

220.    Once an ambulance arrived to transport Mr. Amelia to the hospital, Mr. Amelia was lifted on top of a gurney.  When correctional staff were attempting to position Mr. Amelia on the gurney, an officer tried to force Mr. Amelia's left knee straight.  In response, Mr. Amelia let out a blood curdling scream, and further pleaded with the officer to stop as his knee was not able to go straight due to the injury to his hip.

221.    After being loaded into the ambulance, Mr. Amelia, a recovering drug addict, was given fentanyl to help manage his pain.

222.    Once he arrived in the emergency room at Mon Health Medical Center in Morgantown, West Virginia, Mr. Amelia was told that he had a 103.7-degree temperature.  His blood was also drawn, later revealing that Mr. Amelia was septic.

223.    Shortly after this, Mr. Amelia was rushed to have a CT scan performed.  During the CT scan, and due to the potentially fatal infection in his body, medical staff at Mon Health proceeded to surgically insert a drip-line into Mr. Amelia's left hip to drain the fluid-filled abscesses in and around his hip joint.  Upon information and belief, the doctors drained between ten and twenty ounces of fluid from Mr. Amelia's left hip.

224.    Following the scan and insertion of the drip-line, doctors told Mr. Amelia that he would need emergency surgery and that he was lucky that he came to the hospital when he did because if he had not, he would have died from the extent of the uncontrolled infection that was running rampant throughout his body.

225.    After a few days at Mon Health, the surgery on Mr. Amelia's hip was performed. Doctors made a 12-inch incision where doctors performed a methodical scraping of the septic arthritis that was contained within Mr. Amelia's left hip and upper thigh.  Following the procedure, Mr. Amelia was administered morphine every two hours through an IV to help manage his pain. After the morphine was found not to last long enough to control Mr. Amelia's pain, Mr. Amelia's care team proceeded to administer oxycodone orally every six hours.

226.    Mr. Amelia also had a pic-line inserted in his arm to prepare for the administration of six weeks' worth of intravenous antibiotics to treat the staph infection.

227.    On or about February 6, 2024, Mr. Amelia was transferred to Preston Memorial Hospital, where he received the necessary antibiotics through the pic-line in his arm.  Mr. Amelia also continued to receive the oxycodone every six hours to help manage his pain.

228.    While at Preston Memorial Hospital, Mr. Amelia received physical therapy to help him re-learn to use his arms and attempt to learn to walk again.  Mr. Amelia was told he would need continued physical therapy; however, physical therapy would not be provided by staff at USP Hazelton.

229.    On or about March 13, 2024, Mr. Amelia was released from the hospital and moved back to USP Hazelton, where he was once again given a wheelchair and placed in a handicapped cell.  Mr. Amelia was transported back to USP Hazelton in the same clothes he had left the institution in January.  Mr. Amelia was also not given a clean exchange of clothing, a clean towel, or a clean bed roll until March 25, 2024.

230.    On April 16, 2024, Mr. Amelia was enrolled in the Medication Assisted Treatment ("MAT") Program at USP Hazelton to help temper the effects of the strong narcotics he was prescribed in the hospital.

231.    Mr. Amelia made several attempts to receive his psychiatric medications, but it was not until on or about April 17, 2024 that Mr. Amelia met with someone in Psychology Services at USP Hazelton.  On this date, psychology staff at USP Hazelton diagnosed Mr. Amelia with Post-Traumatic Stress Disorder (PTSD) from the trauma of being placed in the four-point restraints and assaulted for three days at USP Lee.  Mr. Amelia was encouraged to follow up via sick-call in about a week to inquire about the status of the reinstatement of his medication.

232.    However, it was not until July 19, 2024, that Mr. Amelia was prescribed any psychiatric medication.  But then, Mr. Amelia was prescribed both Depakote and Remeron to help reduce his presenting symptoms.

233.    In early July 2024, Mr. Amelia's hip pain again began to worsen, and he made several attempts to get staff to take him back to the hospital.

234. Approximately a week after Mr. Amelia's first attempt to alert medical staff of his worsening conditions, Dr. Mims saw Mr. Amelia and administered an unknown shot for "pain" into Mr. Amelia's left hip. Dr. Mims also told Mr. Amelia that he would be placed on a list to see a "specialist." The shot Dr. Mims administered did little to nothing to curb Mr. Amelia's presenting physical symptoms, and he continued to suffer in agony.

235. It was not until July 22, 2024 that Mr. Amelia was able to convince Dr. Mims that he needed to be transported to Mon Health Medical Center—nearly two and a half weeks after he first alerted medical staff at USP Hazelton that he needed to go back to the hospital for treatment.

236. Three days later, on or around July 25, Mr. Amelia had another surgery to remove the septic arthritis on his left hip and upper thigh. Following his surgery, Mr. Amelia's surgeon informed Mr. Amelia that he would need a hip replacement because of the severity of the septic arthritis in his left hip.

237. However, the surgeon further informed Mr. Amelia that no doctor anywhere would perform the required hip-replacement surgery because of the serious risk of death if the infection were to spread from the hip into the blood during the surgery. The surgeon also explained that any form of physical therapy or walking will further degrade the condition of Mr. Amelia's hip, causing additional pain for which the only treatment is a surgery that Mr. Amelia cannot have. Mr. Amelia is thus confined to his wheelchair and will need to take antibiotics for the rest of his life.

238. On or about July 31, 2024, Mr. Amelia was transferred again to Preston Memorial Hospital where he received antibiotics via a pic-line for a period of seven weeks. Mr. Amelia was yet again also administered oxycodone to help manage his pain.

239.    Following his seven-week stay at Preston Memorial, Mr. Amelia returned to USP Hazelton on or about September 12, 2024.  He was again placed into the MAT Program to help assist him in his transition from the pain medication he had received while in the hospital.

240.    On or about September 16, 2024, Mr. Amelia met with Dr. Mims to discuss the findings from Mr. Amelia's most recent stay in the hospital.  Dr. Mims told Mr. Amelia that he would put together the required information to request that Mr. Amelia be put in for a transfer to a medical facility.  During this conversation, Dr. Mims said that USP Hazelton is not equipped to properly monitor Mr. Amelia's condition.

241.    As of this filing, Mr. Amelia is still awaiting a transfer to a medical facility.

## CAUSES OF ACTION

## COUNT ONE

*Violation of Plaintiff's Eighth Amendment Rights – Gratuitous Violence*
*(Against Defendant Logan Smith, Defendant Robbins, Defendant Sluss, Unknown Transport Defendants, Unknown Four-Point Restraint Defendants, Unknown SHU Defendants, and an Unknown Medical Defendant)*

242.    Plaintiff incorporates by reference the foregoing paragraphs of this Complaint as though fully set forth herein.

243.    The Eighth Amendment to the United States Constitution prohibits "cruel and unusual punishment."

244.    As outlined above, beginning on or around August 26, 2023 and continuing through August 29, 2023, Defendant Logan Smith, Unknown Four-Point Restraint Defendants, and an Unknown Medical Defendant placed and held Mr. Amelia in four-point and ambulatory restraints in direct contravention of BOP policy, and brutally beat and abused him, including with a riot shield and electrical shocks.  Before he was transported to the SHU, after Mr. Amelia and his

59

cellmate were sprayed with OC, an Unknown Transport Defendant walked Mr. Amelia outside of his unit and then slammed Mr. Amelia to the ground.

245. Further, on August 30, 2023, following a request for medical assistance in the shower, Defendant Sluss and Unknown SHU Defendants slammed Mr. Amelia against a wall and hit him repeatedly in his face and head causing him to lose consciousness.

246. Additionally, on or around September 12, 2023, following a visit with medical personnel, Defendant Robbins smacked Mr. Amelia in the face and taunted him. One of the An Unknown SHU Defendant then spit in Mr. Amelia's face.

247. And again, on September 19, 2023, following a visit with medical personnel, Unknown SHU Defendants repeatedly banged Mr. Amelia's head off the walls of the holding tank while Mr. Amelia was handcuffed behind his back.

248. Each of these acts were without justification and for the very purpose of causing harm, in violation of the Eighth Amendment.

249. As a result, Mr. Amelia sustained severe physical injuries, including lacerations and abrasions to the face and ears; gashes to the ankles and wrists from the prolonged use of restraints; severe upper body weakness from prolonged time in the four-point restraints; pain and nerve damage in his shoulders; pain in his left hip from a hematoma; a severe headache; an untreated staph infection in his left hip leading to several month-long hospital stays, multiple surgeries, and the inability to walk without assistance; as well as emotional distress, PTSD, and mental anguish as a result of the Defendants' assaults in August and September 2023.

250. As a direct, foreseeable, and proximate result of the Defendants' deliberate indifferences to Mr. Amelia's health and safety in violation of his Eighth Amendment rights, Mr. Amelia has suffered damages, including, without limitation, incidental, actual, consequential,

and compensatory damages.  Additionally, as a result of the Defendants' egregious, intentional, and reckless conduct in conscious disregard for Mr. Amelia's safety, as well as their pattern and practice of repeatedly violating Mr. Amelia's Eighth Amendment rights, Mr. Amelia is entitled to punitive damages, as well as such other appropriate damages and relief permitted by law, all in an amount to be determined at trial.

## COUNT TWO

*Violation of Plaintiff's Eighth Amendment Rights – Failure to Protect*
*(Against Defendant Streeval, Defendant Wasim, Defendant Corbin, Defendant Glass, Defendant Mitchell, Defendant Bradburn, Defendant Thompson, Defendant Robbins, Defendant Sareena Scott, Defendant Stuart Scott, Unknown Four-Point Restraint Defendants, Unknown Transport Defendants, and Unknown SHU Defendants)*

251.    Plaintiff incorporates by reference the foregoing paragraphs of this Complaint as though fully set forth herein.

252.    The Eighth Amendment to the United States Constitution prohibits "cruel and unusual punishment."  This includes the right to be protected from known and substantial risks of serious harm.

253.    As outlined above, on or around August 26 through August 29, 2023, Mr. Amelia was held in four-point and ambulatory restraints in direct contravention to BOP policies, and brutally abused and beaten, including with a riot shield, and electrical shocks, without justification, by Defendant Logan Smith and Unknown Four-Point Restraint Defendants, and an Unknown Medical Defendant, in violation of the Eighth Amendment.

254.    Defendant Streeval, Defendant Wasim, Defendant Mitchell, Defendant Corbin, the Unknown Transport Defendants, and a number of the Unknown Four-Point Restraint Defendants did not participate in Mr. Amelia's abuse from August 26 to August 29, 2023, but also violated Mr. Amelia's Eighth Amendment rights by disregarding and failing to protect him from the risk of

61

known, unnecessary, and gratuitous force, deliberately indifferent to Mr. Amelia's health and safety.

255.    Defendant Streeval is the only person who could have authorized the prolonged application of restraints against Mr. Amelia, and he did so despite knowing, or with deliberate indifference to the fact that Mr. Amelia was unconscious, and thus both calm and uncombative, when he was placed in four-point restraints.

256.    Prior to this incident, Defendant Wasim and Defendant Mitchell threatened to take Mr. Amelia from his unit and house him in the SHU if he did not stop making requests to Psychology Services for treatment.  Despite this threat, Mr. Amelia did continue to submit requests for psychology-based programming to address his mental health needs.  On August 26, 2023, Mr. Amelia pressed the emergency distress button in his cell to alert staff that he was experiencing both auditory and visual hallucinations and was worried he would harm himself or his cellmate.

257.    In response, Defendant Corbin and the Unknown Transport Defendants ultimately placed Mr. Amelia in a restraint chair, where he promptly lost consciousness, and transported Mr. Amelia to the SHU, where he was placed in restraints and tortured for nearly 72 hours.

258.    It would have been clear to any reasonable observer, and was clear to Defendant Wasim and Defendant Mitchell, who threatened him with this very outcome, and Defendant Corbin and the Unknown Transport Defendants, who shackled an unconscious, and therefore, controlled Mr. Amelia using four-point restraints, that this use of force was gratuitous and unnecessary. Additionally, it would have been clear to the Unknown Four-Point Restraint Defendants who either witnessed Mr. Amelia's assault or saw his injuries, or both, that other Defendants had previously assaulted Mr. Amelia, and based on the assaults that they observed, were all but certainly going to continue to do so.

259.    After Mr. Amelia was moved to a dry cell in the SHU sometime on August 30, 2023, Defendant Robbins, Defendant Bradburn, Defendant Thompson and Unknown SHU Defendants repeatedly observed Mr. Amelia struggle to move about his cell and to carry or otherwise lift his food tray or the items on it.  It would have been clear to any reasonable observer, and was clear to Defendants Robbins, Bradburn, Thompson, and Unknown SHU Defendants, that Mr. Amelia needed immediate medical attention.  In failing to intervene to get him this help, these Defendants were deliberately indifferent to Mr. Amelia's health and safety.

260.    While Mr. Amelia was still in the dry cell, on September 6, Defendant Glass transported Mr. Amelia to a DHO hearing.  During the walk, he told Mr. Amelia to "keep [his] head up . . . [and that he] did nothing wrong."  The comment clearly indicates that Defendant Glass knew the degree of abuse that Mr. Amelia had endured, and that he continued to suffer from a lack of medical care.  In failing to protect him from the risk of known, unnecessary and gratuitous force, and failing to intervene to get Mr. Amelia medical attention, Defendant Glass was deliberately indifferent to Mr. Amelia's health and safety.

261.    Also, on September 6, and again on or around September 21, Defendant Bradburn instructed Mr. Amelia's cellmates to continue to torture and abuse him, not only failing to protect him from the risk of known, unnecessary and gratuitous force, but causing it, deliberately indifferent to Mr. Amelia's health and safety.

262.    In addition, while Defendant Stuart Scott, Defendant Sareena Scott, and a number of the Unknown SHU Defendants did not actively participate in Mr. Amelia's abuse on September 12, 2023, they also violated Mr. Amelia's Eighth Amendment rights by disregarding and failing to protect him from the risk of known, unnecessary, and gratuitous force, deliberately indifferent to Mr. Amelia's health and safety.

63

263.    As noted above, on or around September 12, 2023, Mr. Amelia was smacked across the face by Defendant Robbins, and spit on by an Unknown SHU Defendant.  During this time, Defendant Stuart Scott, Defendant Sareena Scott, and some of the Unknown SHU Defendants were in the room and observed both assaults.  None intervened.  Indeed, the other individuals in the room laughed as Defendant Robbins taunted Mr. Amelia with racially-charged and sexual epithets.  It would have been clear to these Defendants who either witnessed Mr. Amelia's assault or saw his injuries, or both, that other Defendants had previously assaulted Mr. Amelia, and based on the assaults that they observed, were all but certainly going to continue to do so.

264.    On September 19, 2023, following a visit with medical personnel, Defendant Thompson and several Unknown SHU Defendants brought Mr. Amelia to a holding tank to change his clothes.  Still unable to walk and incredibly weak, Defendant Thompson observed Mr. Amelia struggle to change his clothing.  It would have been clear to any reasonable observer, especially Defendant Thompson, who having seen Mr. Amelia struggle in this same way nearly two weeks earlier, that Mr. Amelia needed significant medical attention.  Defendant Thomspon's failure to intervene to ensure that Mr. Amelia received this care reflected a deliberate indifferent to Mr. Amelia's health and safety, in violation of the Eighth Amendment.

265.    Moreover, although Defendant Thompson did not actively participate in Mr. Amelia's assault by the SHU Defendants, he failed to protect Mr. Amelia from the risk of known, unnecessary, and gratuitous force, deliberately indifferent to Mr. Amelia's health and safety in allowing the SHU Defendants to repeatedly bang Mr. Amelia's head off the wall while Mr. Amelia was handcuffed behind his back.

266.    On November 3, after reading Mr. Amelia's legal paperwork, Defendant Robbins again instructed Mr. Amelia's cellmate to torture and abuse him, not only failing to protect him

from the risk of known, unnecessary and gratuitous force, but causing it, deliberately indifferent to Mr. Amelia's health and safety.

267.    As a result of the actions—or more particularly, lack thereof—of Defendant Wasim, Defendant Corbin, Defendant Glass, Defendant Mitchell, Defendant Bradburn, Defendant Thompson, Defendant Robbins, Defendant Sareena Scott, Defendant Stuart Scott, Unknown Fourt-Point Restraint Defendants, Unknown Transport Defendants, and Unknown SHU Defendants, Mr. Amelia suffered severe physical injuries, including lacerations and abrasions to the face and ears; gashes to the ankles and wrists from the prolonged use of restraints; severe upper body weakness from prolonged time in the four-point restraints; pain and nerve damage in his shoulders; pain in his left hip from a hematoma; a severe headache; an untreated staph infection in his left hip leading to several month-long hospital stays, multiple surgeries, and the inability to walk without assistance; as well as emotional distress, PTSD, and mental anguish.

268.    As a direct, foreseeable, and proximate result of these Defendants' deliberate indifference to Mr. Amelia's health and safety, in violation of his Eighth Amendment rights on or around August 26, 2023 and September 12, 2023, Mr. Amelia has suffered damages, including, without limitation, incidental, actual, consequential, and compensatory damages. Additionally, as a result of the Defendants' egregious, intentional, and reckless conduct in deliberate indifference to Mr. Amelia's safety, as well as their pattern and practice of repeatedly violating Mr. Amelia's Eighth Amendment rights, Mr. Amelia is entitled to punitive damages, as well as other such appropriate damages and relief permitted by law, all in an amount to be determined at trial.

### COUNT THREE

*Violation of Plaintiff's Eighth Amendment Rights – Post-Assault Medical Care*
*(Against Defendant Bullock, Defendant York, Defendant Nancy Smith, Defendant Sareena Scott,*

65

*Defendant Stuart Scott, Defendant Ashley, Defendant Baker, Unknown Medical Defendant, and Unknown Hospital Defendants)*

269. Plaintiff incorporates by reference the foregoing paragraphs of this Complaint as though fully set forth herein.

270. The Eighth Amendment to the United States Constitution prohibits cruel and unusual punishment." This right includes the right of residents in federal prison to receive adequate medical care.

271. Defendant Bullock, Defendant York, Defendant Nancy Smith, Defendant Sareena Scott, Defendant Stuart Scott, Defendant Ashley, Defendant Baker, the Unknown Medical Defendant, and the Unknown Hospital Defendants were deliberately indifference to the injuries Mr. Amelia suffered as a result of being placed in the four-point and ambulatory restraints between August 26, 2023 and August 30, 2023 and the subsequent assaults on or around August 30, 2023, September 12, 2023, and September 19, 2023. This caused avoidable, debilitating and permanent physical pain and suffering, mental anguish, and emotional distress.

272. As outlined above, on or around August 26, 2023 through August 29, 2023, Mr. Amelia was held in four-point and ambulatory restraints in direct contravention to BOP policies, and brutally abused and beaten, including with a riot shield and electrical shocks, without justification, by Defendant Logan Smith, Unknown Four-Point Restraint Defendants and an Unknown Medical Defendant, in violation of the Eighth Amendment.

273. Further, on August 30, 2023, following a request for medical assistance in the shower, Defendant Sluss and Unknown SHU Defendants slammed Mr. Amelia against a wall and hit him repeatedly in his face and head causing him to lose consciousness.

274.    Additionally, as outlined above, on or around September 12, 2023, following a visit with medical personnel, Defendant Robbins smacked Mr. Amelia in the face, and taunted him. One of the Unknown SHU Defendants then spit in Mr. Amelia's face.

275.    And again, on September 19, 2023, following a visit with medical personnel, Unknown SHU Defendants repeatedly banged Mr. Amelia's head off the walls of the holding tank while Mr. Amelia was handcuffed behind his back.

276.    Each of these instances was also in violation of the Eighth Amendment.

277.    It would have been objectively clear, and was clear to Defendant Mitchell in particular, that following nearly 72 hours of abuse and torture in four-point and ambulatory restraints, Mr. Amelia needed medical care. Despite this obvious need for medical intervention, none was initially provided.

278.    Instead, in the immediate aftermath of the assaults between August 26 and 29 and on August 30, Mr. Amelia was left in a dry cell for nearly a week, feeble, unable to walk or feed himself, shuffling around on his knees, while Defendant Robbins, Defendant Bradburn and Defendant Thompson and Unknown SHU Defendants repeatedly observed this behavior.  Instead of providing medical care, they merely yelled at him to get up and walk and to eat.

279.    When Mr. Amelia actively sought medical assistance for his injuries, his most significant injuries were completely ignored or mistreated, Mr. Amelia's medical records were falsified, at least in part, and seemingly in an effort to conceal Mr. Amelia's abuse.

280.    When Defendant Bullock saw Mr. Amelia on August 29, it would have been clear to any reasonable observer, and was clear to Dr. Bullock, that Mr. Amelia had just been the victim of a brutal assault and needed medical intervention.  She would have seen, at minimum, that he had cuts and lacerations on his wrists and ankles, that he had difficulty lifting his arms and was in

67

an incredible amount of pain.  On September 27, 2023, she would have seen, at minimum, that he had lost a significant amount of weight since she last saw him, clearly indicative of the fact that he needed additional medical care than he was receiving. Instead, she falsified his medical records to indicate that on August 29, Mr. Amelia reported to her that he had been using drugs and in a conflict with another resident because of a drug debt in the week prior, and that during her September 27 encounter, he denied having been the victim of an assault and that he felt better after being placed in the SHU.

281.    Defendant Sareena Scott feigned the provision of medical care to Mr. Amelia and ignored obvious signs that Mr. Amelia was suffering from a staph infection.  On September 12, Defendant Sareena Scott used a fake stethoscope to take Mr. Amelia's vitals.  After Mr. Amelia insisted that she check his left ankle, she squeezed green ooze out of the wound.  She then laughed and joked that he might lose his leg.  Despite the obvious and out-of-place nature of green ooze from an open wound, Defendant Sareena Scott failed to provide any form of treatment for the injury to Mr. Amelia's left ankle or the bedsores that had developed on Mr. Amelia's back. Defendant Stuart Scott was present when this occurred, and as with Defendant Sareena Scott, it was also clear to Defendant Stuart Scott that Mr. Amelia needed additional medical care.

282.    On September 20, Mr. Amelia showed Defendant Ashely that holes that had developed from restraint lacerations on his left wrist and ankle as a result of a staph infection.  It would have been objectively clear, and was clear to Defendant Ashley, that these wounds were infected and that Mr. Amelia needed medical intervention.  Instead, Defendant Ashley told Mr. Amelia the wounds would heal on their own.

283.    On September 25, after being alerted to Mr. Amelia's deteriorating condition by his cellmate, Defendant York ordered a series of x-rays without actually seeing Mr. Amelia.  Defendant

68

Bradburn escorted Mr. Amelia to the x-ray room, where a series of an estimated 50 x-rays were taken of Mr. Amelia's body, needlessly exposing Mr. Amelia to radiation and without a clear indication about whether x-rays, let alone 50, was an appropriate assessment plan. Defendant York never met with Mr. Amelia. It would have been objectively clear, and was clear to Defendant York, based on what he was told, that not only was this number of x-rays unreasonable, but an inappropriate wholistic assessment tool under the circumstances.

284.    On September 27, when Mr. Amelia met with Defendant Nancy Smith and Defendant Baker and described severe pain in his left shoulder consistent with nerve damage or dislocation, Defendant Nancy Smith ordered an x-ray of Mr. Amelia's right shoulder.

285.    Defendant Baker was often responsible for changing Mr. Amelia's dressings on both his left ankle and the bedsores on his back. It would have been objectively clear and was clear to Defendant Baker in particular, that Mr. Amelia's ankle was infected and that he needed additional treatment and stronger antibiotics than the course he had previously taken.

286.    None of Defendant Sareena Scott, Defendant Stuart Scott, Defendant Nancy Smith, Defendant Baker, or Defendant Ashley ensured that Mr. Amelia received his prescriptions while he was in the SHU.

287.    Additionally, while Mr. Amelia was in the hospital for treatment of the injuries that the Individual Defendants had caused and then ignored, the Unknown Hospital Defendants interfered with hospital staff's care of Mr. Amelia, resulting in a drastic change in course of treatment. After Mr. Amelia was told he needed emergency surgery, the Unknown Hospital Defendants prevented Mr. Amelia from interacting directly with hospital staff, and though he received staph gel in his nose, Mr. Amelia left the hospital with the "assurance" that his hip was simply bruised and that with rest, it would heal on his own.

69

288.    As a direct, foreseeable, and proximate result of Defendant Bullock, Defendant York, Defendant Nancy Smith, Defendant Sareena Scott, Defendant Stuart Scott, Defendant Baker, Defendant Ashley, the Unknown Medical Defendant, and the Unknown Hospital Defendants' deliberate indifference to Mr. Amelia's serious medical needs, Mr. Amelia has suffered unnecessary and wanton infliction of pain in violation of the Eighth Amendment.  And as a result, he is entitled to damages, including, without limitation, incidental, actual, consequential, and compensatory damages.  Additionally, as a result of  Defendant Bullock's, Defendant York's, Defendant Nancy Smith's, Defendant Sareena Scott's, Defendant Stuart Scott's, Defendant Baker's Defendant Ashley's, the Unknown Medical Defendant's, and the Unknown Hospital Defendants' egregious, intentional, and reckless conduct in conscious disregard for Mr. Amelia's safety, as well as his pattern and practice of repeatedly violating Mr. Amelia's Eighth Amendment rights, Mr. Amelia is entitled to punitive damages, as well as such other appropriate damages and relief permitted by law, all in an amount to be determined at trial.

## COUNT FOUR

*Violation of Plaintiff's Eighth Amendment Rights – Mental Health Medical Care*
*(Against Defendant Streeval, Defendant Bullock, Defendant Wasim, Defendant York, and*
*Defendant Nancy Smith)*

289.    Plaintiff incorporates by reference the foregoing paragraphs of this Complaint as though fully set forth herein.

290.    The Eighth Amendment to the United States Constitution prohibits cruel and unusual punishment."  This right includes the right of residents in federal prison to receive adequate medical care.

291.    Defendants who act with deliberate indifference to an objectively serious medical need violate the Eighth Amendment's prohibition on cruel and unusual punishment.  Here, Defendant Streeval's, Defendant Bullock's, Defendant Wasim's, Defendant York's and Defendant

70

Nancy Smith's deliberate indifference to Mr. Amelia's mental health and psychological needs caused avoidable physical pain and suffering, mental anguish, emotional distress, and the deterioration of his health.

292. These Defendants' policies, practices, acts, and/or omissions in refusing to provide Mr. Amelia mental health care despite a clear history and a demonstrated necessity of a medication-assisted treatment regime, the prior receipt of social security disability benefits, the number of requests from Mr. Amelia to reinstate that regime or provide alternative programmatic or therapeutic treatment, and the lack of any medical contra-indications for doing so constitute and reflect deliberate indifference to Mr. Amelia's serious medical needs and violate the Cruel and Unusual Punishment Clause of the Eighth Amendment of the United States Constitution.

293. Defendants' policies, practices, acts, and/or omissions placed Mr. Amelia at an unreasonable risk of suffering new or worsening mental health and medical illnesses, injuries, and harm.

294. As a direct, foreseeable, and proximate cause of these Defendants' unconstitutional policies, practices, acts, and/or omissions regarding the provision of inadequate mental health medical care at USP Lee, Mr. Amelia suffered irreparable injury, including physical, psychological, and emotional injury.

295. As a result, Mr. Amelia has sustained damages, including without limitation, incidental, actual, consequential, and compensatory damages. Additionally, as a result of Defendant Streeval's, Defendant Bullock's, Defendant Wasim's, Defendant York's and Defendant Nancy Smith's egregious, intentional, and reckless conduct in conscious disregard for Mr. Amelia's mental health care, as well as their pattern and practice of repeatedly violating Mr.

71

Amelia's Eighth Amendment rights, Mr. Amelia is entitled to punitive damages, as well as such other appropriate damages and relief permitted by law, all in an amount to be determined at trial.

## COUNT FIVE

*Assault and Battery Pursuant to Federal Tort Claims Act*
*28 U.S.C. § 1346(b)*
*(Against Defendant United States of America)*

296.    Plaintiff incorporates by reference the foregoing paragraphs of this Complaint as though fully set forth herein.

297.    The Federal Tort Claims Act permits private parties to sue the United States of America in a federal court for torts, including intentional torts arising out of assault, battery, false imprisonment, false arrest, abuse of process, and malicious prosecution, committed by persons acting on behalf of the United States of America, including the acts or omissions of investigative or law enforcement officers of the United States Government.

298.    Under Virginia law, assault is established by: (1) an act intended to cause either harmful or offensive contact with another person, or (2) apprehension of such contact, and that creates in that other person's mind a reasonable apprehension of an imminent battery.  Battery is an unwanted touching which is neither consented to, excused, nor justified.

299.    As outlined above, on or around August 26, 2023 through August 29, 2023, on August 30, 2023, on September 12, 2023 and on September 19, 2023 Defendant Logan Smith, Unknown Four-Point Restraint Defendants and an Unknown Medical Defendant, Defendant Sluss and Unknown SHU Defendants, Defendant Robbins and an Unknown SHU Defendant, and Unknown SHU Defendants, respectively, touched Mr. Amelia in a vicious, rude, insulting, brutal, unwanted, and offensive manner, again causing Mr. Amelia significant harm.

300.    Beyond mere touching, Defendant Logan Smith, Unknown Four-Point Restraint Defendants and an Unknown Medical Defendant, Defendant Sluss and Unknown SHU

72

Defendants, Defendant Robbins and an Unknown SHU Defendant, and Unknown SHU Defendants, without provocation or justification, placed Mr. Amelia in four-point and ambulatory restraints that were unwarranted and too tight; slammed and scraped a barbed riot shield against his body while in four-point restraints; beat him while in ambulatory restraints; shocked him with electrical current while in ambulatory restraints; slammed his head and body into concrete walls; slapped him; and directed others to torture and abuse him.

301.    These touchings by these Defendants were unsolicited by Mr. Amelia, unwanted, and wholly inappropriate. The touchings were neither consented to, excused, nor justified. Further, these Defendants engaged in these acts, including berating and threatening Mr. Amelia, intending to create a reasonable apprehension of immediate, unwanted, and offensive touching of Mr. Amelia.

302.    During the tortious conduct committed by Defendant Logan Smith, Unknown Four-Point Restraint Defendants and an Unknown Medical Defendant, Defendant Sluss and Unknown SHU Defendants, Defendant Robbins and an Unknown SHU Defendant, and Unknown SHU Defendants against Mr. Amelia, each of these Defendants were acting within the scope of his or her employment duties as officers and agents of the federal government, and therefore, such conduct is imputable to Defendant United States of America.

303.    The actions by these officers were malicious, intentional, and amounted to extreme and outrageous conduct. As a proximate result of such conduct, Mr. Amelia has and continues to suffer physical injuries, lacerations and abrasions to the face and ears; gashes to the ankles and wrists from the prolonged use of restraints; severe upper body weakness from prolonged time in the four-point restraints; pain and nerve damage in his shoulders; pain in his left hip from a hematoma; a severe headache; an untreated staph infection in his left hip leading to several month-

73

long hospital stays, multiple surgeries, and the inability to walk without assistance; as well as emotional distress, PTSD, and mental anguish for which the United States of America is liable.

## COUNT SIX

*Negligent Failure to Protect Pursuant to the Federal Tort Claims Act*
*28 U.S.C. § 1346(b)*
*(Against Defendant United States of America)*

304.    Plaintiff incorporates by reference the foregoing paragraphs of this Complaint as though fully set forth herein.

305.    The Federal Tort Claims Act permits private parties to sue the United States of America in a federal court for torts committed by persons acting on behalf of the United States of America.

306.    Under Virginia law, a negligence claim is established by: (1) the existence of a duty of care; (2) breach of that duty; (3) legal causation; and (4) damages.

307.    Defendant Streeval, Defendant Wasim, Defendant Corbin, Defendant Glass, Defendant Mitchell, Defendant Bradburn, Defendant Thompson, Defendant Robbins, Defendant Sareena Scott, Defendant Stuart Scott, Unknown Four-Point Restraint Defendants, Unknown Transport Defendants, and Unknown SHU Defendants, in the exercise of reasonable care, and pursuant to their authority and responsibilities as medical providers, officials, employees, and/or agents of the United States of America, had a duty to keep Mr. Amelia safe, and they knew, or should have known that their failure to intervene to prevent or limit Mr. Amelia's assault, as well as their failure to provide adequate medical care to Mr. Amelia during and after these assaults, put Mr. Amelia at risk of physical, mental, and emotional injury.

308.    Defendant Wasim, Defendant Corbin, Defendant Glass, Defendant Mitchell, Defendant Bradburn, Defendant Thompson, Defendant Robbins, Defendant Sareena Scott, Defendant Stuart Scott, Unknown Four-Point Restraint Defendants, Unknown Transport

Defendants, and Unknown SHU Defendants, in their capacity as and pursuant to their authority and responsibilities as medical providers, officials, employees, and/or agents of the United States of America, breached their duty by failing to intervene regarding the prolonged and unwarranted use of restraints and unjustified force and abuse, and they did so deliberately or carelessly, without proper regard to the risk of harm to Mr. Amelia, and by failing to carefully investigate, monitor, supervise, provide, and/or oversee the provision of medical care to Mr. Amelia, including but not limited to the failure to intervene to prevent or limit Mr. Amelia's assault.

309. These Individual Defendants knew or should have known that Mr. Amelia would foreseeably suffer injury as a result of their failure to exercise reasonable care in the discharge of their official duties and/or common-law duties of care described herein.

310. As a direct and proximate result of the negligence and carelessness of these Individual Defendants, Mr. Amelia has suffered extreme physical, emotional, and mental distress. As a direct and proximate result of these Individual Defendants' acts or omissions, Mr. Amelia has suffered injuries for which he seeks compensatory and actual damages against the United States.

### COUNT SEVEN

*Negligent Failure to Provide Post-Assault Medical Care Pursuant to the Federal Tort Claims Act*
*28 U.S.C. § 1346(b)*
*(Against Defendant United States of America)*

311. Plaintiff incorporates by reference the foregoing paragraphs of this Complaint as though fully set forth herein.

312. The Federal Tort Claims Act permits private parties to sue the United States of America in a federal court for torts committed by persons acting on behalf of the United States of America.

313. Under Virginia law, a negligence claim is established by: (1) the existence of a duty of care; (2) breach of that duty; (3) legal causation; and (4) damages.

75

314.   Defendant Bullock, Defendant York, Defendant Nancy Smith, Defendant Sareena Scott, Defendant Stuart Scott, Defendant Ashley, Defendant Baker, Unknown Medical Defendant, and Unknown Hospital Defendants, in the exercise of reasonable care, and pursuant to their authority and responsibilities as medical providers, officials, employees, and/or agents of the United States of America, had a duty to know, or should have known that their failure to provide adequate medical care to Mr. Amelia during and post-assault, put Mr. Amelia at risk of physical, mental, and emotional injury.

315.   Defendant Bullock, Defendant York, Defendant Nancy Smith, Defendant Sareena Scott, Defendant Stuart Scott, Defendant Ashley, Defendant Baker, Unknown Medical Defendant, and Unknown Hospital Defendants, in their capacity as and pursuant to their authority and responsibilities as medical providers, officials, employees, and/or agents of the United States of America, breached their duty by failing to carefully investigate, monitor, supervise, provide, and/or oversee the provision of adequate medical care to Mr. Amelia at USP Lee, including but not limited to the failure to provide adequate medical care during and following Mr. Amelia's assault.

316.   Defendant Bullock, Defendant York, Defendant Nancy Smith, Defendant Sareena Scott, Defendant Stuart Scott, Defendant Ashley, Defendant Baker, Unknown Medical Defendant, and Unknown Hospital Defendants knew or should have known that Mr. Amelia would foreseeably suffer injury as a result of their failure to exercise reasonable care in the discharge of their official duties and/or common-law duties of care described herein.

317.   As a direct and proximate result of the negligence and carelessness of the Individual Defendants, Mr. Amelia has suffered extreme physical, emotional, and mental distress.  As a direct and proximate result of the Individual Defendants' acts or omissions, Mr. Amelia has suffered injuries for which he seeks compensatory and actual damages against the United States.

## <u>COUNT EIGHT</u>

*Negligent Failure to Provide Mental Health Care Pursuant to the Federal Tort Claims Act*
*28 U.S.C. § 1346(b)*
*(Against Defendant United States of America)*

318. Plaintiff incorporates by reference the foregoing paragraphs of this Complaint as though fully set forth herein.

319. The Federal Tort Claims Act permits private parties to sue the United States of America in a federal court for torts committed by persons acting on behalf of the United States of America.

320. Under Virginia law, a negligence claim is established by: (1) the existence of a duty of care; (2) breach of that duty; (3) legal causation; and (4) damages.

321. Defendant Streeval, Defendant Bullock, Defendant Wasim, Defendant York, and Defendant Nancy Smith, in the exercise of reasonable care, and pursuant to their authority and responsibilities as medical providers, officials, employees, and/or agents of the United States of America, had a duty to know, or should have known, that given his history of diagnosed mental health disorders, their failure to provide adequate mental health care to Mr. Amelia during his time at USP Lee, put Mr. Amelia at risk of physical, mental, and emotional injury.

322. Defendant Streeval, Defendant Bullock, Defendant Wasim, Defendant York, and Defendant Nancy Smith, in their capacity as and pursuant to their authority and responsibilities as medical providers, officials, employees, and/or agents of the United States of America, breached their duty by failing to carefully investigate, monitor, supervise, provide, and/or oversee the provision of adequate medical care to Mr. Amelia at USP Lee, including but not limited to the development, implementation, and supervision of adequate policies and practices for administering mental health care; failing to provide Mr. Amelia with his prescribed medications;

77

failure to otherwise treat his diagnosed mental health illnesses; and retaliating against Mr. Amelia for requesting treatment.

323. Defendant Streeval, Defendant Bullock, Defendant Wasim, Defendant York, and Defendant Nancy Smith knew or should have known that Mr. Amelia would foreseeably suffer injury as a result of their failure to exercise reasonable care in the discharge of their official duties and/or common-law duties of care described herein.

324. As a direct and proximate result of the negligence and carelessness of these Individual Defendants, Mr. Amelia has suffered extreme physical, emotional, and mental distress. As a direct and proximate result of these Individual Defendants' acts or omissions, Mr. Amelia has suffered injuries for which he seeks compensatory and actual damages against the United States.

## COUNT NINE

*Medical Malpractice During and Following Mr. Amelia's Assault Pursuant to the*
*Federal Tort Claims Act*
*28 U.S.C. § 1346(b)*
*(Against Defendant United States of America)*

325. Plaintiff incorporates by reference the foregoing paragraphs of this Complaint as though fully set forth herein.

326. The Federal Tort Claims Act permits private parties to sue the United States of America in a federal court for torts committed by persons acting on behalf of the United States of America.

327. Virginia law recognizes medical malpractice claims where a plaintiff establishes that a defendant violated the applicable standard of care and, therefore, was negligent, and that the defendant's negligent acts were the proximate cause of injury or death.

328. Defendant Bullock, Defendant York, Defendant Nancy Smith, Defendant Sareena Scott, Defendant Stuart Scott, Defendant Ashley, Defendant Baker, Unknown Medical Defendant,

78

and Unknown Hospital Defendants, in their capacity as pursuant to their authority and responsibilities as medical providers, officials, employees, and/or agents of the United States of America, owed Mr. Amelia a duty to render medical care and services using the reasonable care, skill, or knowledge ordinarily used under similar circumstances.

329.    Defendant Bullock, Defendant York, Defendant Nancy Smith, Defendant Sareena Scott, Defendant Stuart Scott, Defendant Ashley, Defendant Baker, Unknown Medical Defendant, and Unknown Hospital Defendants breached their duty of care by failing to ensure that Mr. Amelia received from them reasonable care, skill or knowledge ordinarily used under similar circumstances incident to his medical treatment when they failed to accurately document and treat Mr. Amelia's injuries, falsified medical records to justify this failure, failed to provide him his prescribed medication, and interfered with the provision of appropriate medical care at the hospital.

330.    As a proximate and causal result of the malpractice of Defendant Bullock, Defendant York, Defendant Nancy Smith, Defendant Sareena Scott, Defendant Stuart Scott, Defendant Ashley, Defendant Baker, Unknown Medical Defendant, and Unknown Hospital Defendants, Mr. Amelia has endured physical, mental, and emotional pain and suffering for which the United States of America is liable.

### COUNT TEN

*Medical Malpractice for Mr. Amelia's Mental Health Care Pursuant to the*
*Federal Tort Claims Act*
*28 U.S.C. § 1346(b)*
*(Against Defendant United States of America)*

331.    Plaintiff incorporates by reference the foregoing paragraphs of this Complaint as though fully set forth herein.

79

332.    The Federal Tort Claims Act permits private parties to sue the United States of America in a federal court for torts committed by persons acting on behalf of the United States of America.

333.    Virginia law recognizes medical malpractice claims where a plaintiff establishes that a defendant violated the applicable standard of care and, therefore, was negligent, and that the defendant's negligent acts were the proximate cause of injury or death.

334.    Defendant Bullock, Defendant Wasim, Defendant York, and Defendant Nancy Smith, in their capacity as pursuant to their authority and responsibilities as medical providers, officials, employees, and/or agents of the United States of America, owed Mr. Amelia a duty to render medical care and services using the reasonable care, skill, or knowledge ordinarily used under similar circumstances.

335.    Defendant Bullock, Defendant Wasim, Defendant York, and Defendant Nancy Smith breached their duty of care by failing to ensure that Mr. Amelia received from them reasonable care, skill, or knowledge ordinarily used under similar circumstances incident to his mental health treatment when they failed to develop, implement, and supervise adequate policies and practices for administering mental health care; and where, given the knowledge of Mr. Amelia's mental health history, including his prior receipt of social security disability benefits, they disregarded Mr. Amelia's his reported symptoms, failed to provide him with his prescribed medications, and failed to otherwise treat his diagnosed mental health illnesses.

336.    As a proximate and causal result of the malpractice of Defendant Bullock, Defendant Wasim, Defendant York, and Defendant Nancy Smith, Mr. Amelia has endured physical, mental, and emotional pain and suffering for which the United States of America is liable.

80

## **RELIEF SOUGHT**

A.      Plaintiff seeks to be fully and fairly compensated for his injuries, pain, suffering, emotional, and mental distress to the fullest extent permitted under federal law;

B.      Plaintiff requests $10,000,000 in compensatory damages from Defendants;

C.      Plaintiff requests $5,000,000 in punitive damages from Defendants;

D.      Plaintiff requests pre-judgment interest and post-judgment interest, together with an award of fees incurred in this case (including attorneys' fees), expenses, disbursements, and costs arising from this action; and

E.      Plaintiff requests any and all other relief this Court deems just and proper.

## **JURY DEMAND**

Plaintiff requests a trial by jury on all counts so triable.

Dated:  October 9, 2024                         Respectfully submitted,

[Signatures on the following page]

81

*/s/ W. Hunter Winstead*
**W. Hunter Winstead**
Virginia Bar Number: 66770
December L. Huddleston
(*pro hac vice* forthcoming)
William H. Swain
(*pro hac vice* forthcoming)
Chelsea A. Krzaczek
(*pro hac vice* forthcoming)
Gilbert LLP
700 Pennsylvania Avenue, SE
Suite 400
Washington, DC 20003
Telephone:   (202) 772-2301
Email: WinsteadH@GilbertLegal.com
Email: HuddlestonD@GilbertLegal.com
Email: SwainW@GilbertLegal.com
Email: KrzaczekC@GilbertLegal.com

*/s/ Kristin L. McGough*
Kristin L. McGough
(*pro hac vice* forthcoming)
Washington Lawyers' Committee for Civil
Rights and Urban Affairs
700 14th Street, NW
Suite 400
Washington, DC 20005
Telephone:   (202) 319-1000
Email: Kristin_McGough@washlaw.org

*Counsel for Plaintiff Ryan Amelia*